Hector Andres
MARROQUIN–MANRIQUEZ,
Petitioner,

v.

The IMMIGRATION AND NATURALI-
ZATION SERVICE, Respondent.

No. 82–3163.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
Jan. 7, 1983.

Decided Jan. 27, 1983.

Rehearing and Rehearing In Banc
Denied Feb. 28, 1983.

Shelley Davis, Margaret Winter, New York City, for petitioner.

Alexander Ewing, Jr., Thomas J. McBride, Asst. U.S. Attys., Philadelphia, Pa., Lauri Steven Filppu, General Litigation and Legal Advice Section, Crim. Div., Donald B. Nicholson, Dept. of Justice, Washington, D.C., for respondent.

Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This petition for review of a Board of Immigration Appeals order presents two major questions: whether petitioner met his burden of proof that he would be subject to political persecution if deported to Mexico; and whether the immigration judge abused his discretion in denying petitioner's discovery motions. We conclude that there was no reversible error, and deny the petition for review.

I.

Hector Andres Marroquin-Manriquez, a native and citizen of Mexico, entered the United States on September 18, 1977, representing that he was a citizen of the United States. Upon questioning by border officials, he admitted that he was a Mexican citizen and that the documents that he presented purporting to show that he was a United States citizen were fraudulent. Two days later he was tried and convicted of violating 8 U.S.C. § 1325 [1] in obtaining

---

1. Section 1325 provides:

Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor and upon conviction thereof be punished by imprisonment for not more than six months, or by a fine of not more than $500, or by both, and for a subsequent commission of any such offenses shall be guilty of a felony and upon conviction thereof shall be punished by im-

entry into the United States without inspection and by a willfully false representation. Thereafter, INS issued a rule to show cause why petitioner should not be deported.[2]

Prior to the hearing, however, Marroquin petitioned for political asylum. Upon inquiry, the Department of State gave its opinion that petitioner did not qualify for asylum, and on December 21, 1978, the INS district director denied his petition. Petitioner then asked the immigration judge to issue letters rogatory to two Mexican officials and a subpoena duces tecum to the legal attache at the American Embassy in Mexico City. These requests also were denied.

At his hearing, Marroquin admitted that he was a citizen of Mexico, that he had attempted to enter the United States using false documents, and that he had been convicted under 8 U.S.C. § 1325. On the basis of these admissions, the immigration judge held that deportability had been established.

The principal focus of the hearing was petitioner's request for asylum and application for withholding of deportation under § 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h). He produced testimony disclosing that, as a university student, he had been a member of the Student Revolutionary Commission (CER) which was involved in protesting conditions at the University of Nuevo Leon in Monterrey, and that he later became a Marxist. Petitioner testified that in 1974 he had learned of the murder of a fellow member of the CER, that a subsequent newspaper article linked petitioner to the killing, and that upon recommendation of an attorney, he had gone to Baja, California, to stay with relatives. He said that while there he made his decision to leave Mexico for the United States. He testified that he did not go to the American Embassy to seek asylum because he had read in a book that American agents were involved with Mexican authorities in connection with a certain student demonstration.

He testified further that he had entered the United States on April 9, 1974, and traveled to Houston, Texas, where he worked in a bar under the name of Roberto Zamora, that on April 23, 1974, an article appeared in a Mexican newspaper describing a shootout in Mexico between police and four individuals, and that he was identified as one of the four. He denied any involvement in this shooting incident, stating that he was working in Houston at the time. He submitted pay stubs in the name of Roberto Zamora showing Houston employment during the particular week. He also testified that he travelled to Mexico in June 1977 to meet with an attorney about the likelihood of a fair trial on the shooting escapade if he surrendered to Mexican authorities. Petitioner testified that the attorney told him that a fair trial was impossible and that he should stay out of Mexico.

Upon cross-examination he testified that his wife, who lives in Mexico, shares his political views, and that, although the Mexican government discriminates against Marxists, his wife has suffered no persecution. He further testified that he has never been persecuted or jailed in Mexico, that neither his mother nor any of his brothers and sisters has suffered any harassment by the authorities.

Robert K. Goldman, Professor of Law at American University, active in the civil rights movement, testified as an expert witness on petitioner's behalf. He reported that approximately 100 alleged political prisoners who he had interviewed in Mexico all claimed that they had been illegally de-

---

prisonment for not more than two years, or by a fine of not more than $1,000, or both.

**2.** Section 241 of the Immigration and Nationality Act provides:

(a) Any alien in the United States ... shall, upon the order of the Attorney General, be deported who—

. . . .

(2) entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or in violation of any other law of the United States. . . .

8 U.S.C. § 1251(a)(2).

tained by a so-called "white brigade" or "*brigada blanca*" made up of government agents. He said that the prisoners alleged that they had been tortured and that most of them alleged that they had been coerced to confess to crimes they did not commit. Notwithstanding his accounts of political persecution in Mexico, however, when asked if in his opinion, Marroquin had a well-founded fear of persecution, Professor Goldman responded that he could not conclusively state one way or the other. Mrs. Rosario Ibarra de Piedra, founder of a committee involved in investigating political incarceration, also offered her opinion that petitioner would be kidnapped and tortured if returned to Mexico. Roger Rudenstein, executive director of the Political Rights Defense Fund, testified that he had received and processed 50,000 documents from the Federal Bureau of Investigation pertaining to the general operations of the FBI in Mexico, and that in his view they would show numerous illegal acts by the FBI. He offered the opinion that the FBI had a hand in what he called the "frame up" of petitioner.

Relying upon petitioner's admission of the use of fraudulent documents upon entering the United States and his subsequent conviction, the immigration judge held that petitioner was deportable as charged. In denying the request for withholding of deportation, the judge noted that neither petitioner nor his family had ever been persecuted in Mexico, that Mexico had enacted an Amnesty Law [3] for political prisoners in 1978, that petitioner had received considerable exposure on a speaking tour throughout the United States, and that he presumably had friends who would speak on his behalf to the Mexican authorities. The immigration judge also noted that other members of the CER had been released from custody, that petitioner had made several trips to

Mexico without being apprehended, and that he had been in the United States for three years without applying for political asylum. The judge credited Professor Goldman and Mrs. Piedra's testimony that there was some persecution of political dissidents in Mexico, but determined that the record as a whole did not sustain the claim that Marroquin himself would be persecuted upon his return to Mexico.

On appeal, the Board of Immigration Appeals held that petitioner was estopped by his § 1325 conviction from contesting his deportability. With respect to the persecution claim, the Board determined that although there was evidence suggesting that there may have been some political repression and persecution in Mexico, this evidence did not demonstrate the likelihood that the petitioner himself would be subject to persecution. The Board found that, although petitioner had been mentioned in Mexican newspaper articles, the Mexican police are officially interested in the petitioner with respect to only one episode, the alleged shootout with police on April 23, 1974. The Board determined that petitioner had not satisfactorily established that he was not involved in the incident and that, even if the charges were false, he had not shown that he could not get a fair trial in Mexico.

In his petition to this court, Marroquin contends that the Board employed an incorrect burden of proof, that he adequately demonstrated that he would be persecuted upon his return to Mexico, that the immigration judge's denial of his requests for letters rogatory and a subpoena duces tecum was a violation of due process, and that he did not enter this country without inspection or under false pretenses.

---

**3.** The Law provides amnesty, *inter alia:*

In those cases involving attempts against another person's life, bodily harm, terrorism and kidnapping, the benefits of amnesty can be extended to those who, according to the opinion of the Attorney General of the Republic and the Attorney General for the Federal District, in accordance with the reports

provided by the General Bureau of Coordinated Services for Prevention and Social Rehabilitation of the Interior Secretariat to the effect that said persons had indeed, taken part in committing these actions but who do not reveal a high degree of danger.

D.O. Sept. 28, 1978, informal translation *reprinted in* app. at 945.

## II.

■ Petitioner contends first that the Board applied an erroneous burden of proof. Relying on *Stevic v. Sava,* 678 F.2d 401 (2d Cir.1982), *petition for cert. filed,* 51 U.S. L.W. 3484 (U.S. Dec. 10, 1982) (No. 82–973), he argues that although the Board required him to demonstrate a "clear probability" of persecution, recent amendments require a less stringent standard, "well founded fear." Petitioner apparently has overlooked our recent decision in *Rejaie v. INS,* 691 F.2d 139 (3d Cir.1982), in which we rejected *Stevic's* analysis and concluded that the new "well founded fear" standard equates with the "clear probability of persecution" standard formerly employed.[4] Therefore, we find no error in the Board's use of the "clear probability" standard.

## III.

Alternatively, petitioner argues that he met his burden of proof, even if denominated "clear probability." On judicial review of a final order of deportation, the standard of review is whether the Board of Immigration Appeals' denial of petitioner's request for withholding of deportation under § 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), was an abuse of discretion.[5] We will not disturb the Board's exercise of discretion unless we find "it is arbitrary, irrational or contrary to law." *So Chun Chung v. INS,* 602 F.2d 608, 612 (3d Cir.1979).

Limitations on deportation of one who requests asylum are set forth in § 243(h) of the Act:

The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that

such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1253(h)(1).

In *Rejaie* we delineated the specifics of the burden of proof placed upon an alien seeking asylum:

[T]he Board takes into consideration an alien's apprehensions of persecution, but also requires him to produce objective evidence which demonstrates the realistic likelihood that he, or a class to which he belongs will be persecuted. Generalized, undocumented fears of persecution or political upheaval which affect a country's general populace are insufficient bases for withholding deportation under § 243(h).

691 F.2d at 145.

After a detailed analysis of the evidence adduced in a three-day hearing, the Board determined that petitioner "failed to establish a well founded fear of persecution such that his life or freedom would be threatened [in Mexico] on account of ... political opinion." Board opinion at 10, *reprinted in* app. at 11.

■ Upon independent review of the evidence we find no abuse of agency discretion. The Board committed no error of law in determining that petitioner failed to meet his burden and in concluding that "[t]here is no compelling reason to believe that the [petitioner] would not receive a fair trial in Mexico and, if the evidence of his innocence is as convincing as he asserts, be exonerated of the charge." *Id.* at 6,[6]

---

**4.** Indeed, in this case the Board used the two phrases interchangeably. *See* app. at 3, 11.

**5.** We are aware that the Ninth Circuit in *McMullen v. INS,* 658 F.2d 1312 (9th Cir.1981), held that because the Attorney General has no discretion to deny asylum where deportation would endanger life or liberty, the appropriate standard of review was the "substantial evidence" test. We reject this conclusion because it ignores the necessary application of expertise implicated in the determination that a fear of persecution is well-founded. Given the facts of

this case, however, we would uphold the agency's determination under either standard.

**6.** In this respect the Board noted:

The judicial system of Mexico is generally regarded as among the most advanced and enlightened of all countries in Central and South America. While isolated aberrations to the fair trial norm may occur, the respondent's expert witness law professor also testified to his belief that even in parts of the United States, people are sometimes subject-

*reprinted in* app. at 7. Particularly pertinent is the testimony of petitioner's own expert witness, Professor Robert Goldman, who was unable to "state conclusively one way or the other" that petitioner would be subject to political persecution. Moreover, we agree with the Board that the Mexican Amnesty Law probably diluted many of petitioner's basic contentions. We note the evidence that petitioner's family had not undergone threats, prosecution, or harassment. We now turn to the denial of the discovery requests.

## IV.

■ It is well established that the scope and conduct of discovery are within the sound discretion of the trial court, *Borden Co. v. Sylk,* 410 F.2d 843, 845 (3d Cir.1969), and that after final judgment of the district court or final agency order, our review is confined to determining if that discretion has been abused, *Montecatini Edison S.p.A. v. E.I. du Pont de Nemours & Co.,* 434 F.2d 70, 72 (3d Cir.1970). To find such abuse it is usually necessary to conclude that there has been an interference with a "substantial right," *Goldman v. Checker Taxi Co.,* 325 F.2d 853, 856 (7th Cir.1963), or that the discovery ruling is "seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case." *Voegeli v. Lewis,* 568 F.2d 89, 96 (8th Cir.1977).

■ Petitioner contends that the denial of the requested letters rogatory and subpoena duces tecum constituted violation of due process. The due process implications of deportation and exclusion cases recently have been summarized in *Landon v. Plasencia,* —— U.S. ——, ——––——, 103 S.Ct. 321, 328–330, 74 L.Ed.2d 21 (1982): An alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative. Once an alien gains admission to our country, however, and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly. A continuously present resident alien is entitled to a fair hearing when threatened with deportation, and has a right to due process in such a situation. The constitutional sufficiency of procedures provided in any situation, varies with the circumstances. In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures.[7]

Marroquin has a substantial liberty interest at stake. He stands to lose the right "to stay and live and work in this land of freedom." *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945). Moreover, he argues that he would be persecuted upon his return to Mexico. To vindicate these interests he sought discovery procedures to attempt to prove that his probable prosecution for a street crime will be in reality a persecution for political views.

The government's interest in these cases has been set forth in *Landon v. Plasencia:*

The government's interest in efficient administration of the immigration laws at the border also is weighty. Further, it must weigh heavily in the balance that control over matters of immigration is a

---

ed to persecution and civil rights abuses. Even if so, this of itself would be insufficient reason to presume in advance that a specific instance of persecution would occur here. Similarly, we are unwilling to conclude, and the record does not sufficiently show, that this individual respondent would be persecuted in Mexico and be unable to obtain a fair trial on the police shoot-out charge against him.
Board opinion at 6–7, *reprinted in* app. at 7–8.

7. In the view we take in this case, we will assume, without deciding, that the petitioner is a continuously present resident alien entitled to due process protection.

sovereign prerogative, largely within the control of the executive and the legislature. . . . The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.

—— U.S. at ——, 103 S.Ct. at 330 (citations omitted). In deportation cases

> the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence in his own behalf, and to cross-examine witnesses presented by the Government . . . .

8 U.S.C. § 1252(b)(3). INS regulations provide for the issuance of subpoenas, 8 C.F.R. § 287.4 (1982),[8] and in appropriate cases the taking of interrogatories or letters rogatory in foreign countries, generally assimilating the procedure prescribed in the Federal Rules of Civil Procedure which are used as guidelines when practical, § 242.14(e). *See In re Vardjan,* 10 I. & N.Dec. 567 (1964); 1A C. Gordon and H. Rosenfield, Immigration Law and Procedure § 5.9g (1982); *see also In re McNeil,* 11 I. & N.Dec. 378, 389 (1965) (Federal Rules of Civil Procedure are not controlling in deportation proceedings).

### A.

■ Petitioner requested letters rogatory of Mexican officials Carlos Solano Macias and Hector Villagra Caletti, alleging that their testimony would establish that they deliberately exposed petitioner to torture and assassination, and that they have directed the torture of political prisoners. Marroquin contended that the two officials falsely charged him with complicity in murder of a librarian in Monterrey, Mexico and other crimes occurring after petitioner entered in the United States in April 1974. Rule 28(b) of the Federal Rules of Civil Procedure provides that "a letter rogatory shall be issued on application and notice and on terms that are just and appropriate." In immigration proceedings, a party seeking a letter rogatory has the burden of showing necessity and feasibility. *In re Vardjan,* 10 I. & N.Dec. at 570–72. Thus, we measure the immigration judge's denial against the familiar abuse of discretion standard.

■ We find no abuse for two discrete reasons, one procedural and one going to the merits of the request. The record indicates that the immigration judge suggested to petitioner that, instead of the more formal letters rogatory,[9] interrogatories and cross interrogatories be prepared. The judge recorded that his suggestion of "expeditious submission" of interrogatories "was declined at the hearing." Opinion at 4, *reprinted in* app. at 177.

More persuasive here, however, is that petitioner sought to obtain from these officials statements, against their own interest,

---

**8.** Section 287.4(a)(2) in part provides that

> a district director or a special inquiry officer having jurisdiction over the matter may, upon his own volition or upon application of a trial attorney, the alien, or other party affected, issue subpoenas requiring the attendance of witnesses or for the production of books, papers and other documentary evidence, or both. A party applying for a subpoena shall be required, as a condition precedent to its issuance, to state in writing or at the proceeding what he expects to prove by such witnesses or documentary evidence, and to show affirmatively that he has made diligent effort, without success to produce the same. Upon being satisfied that a witness will not appear and testify or produce documentary evidence and that his evidence is essential, the district director or special inquiry officer shall issue a subpoena.

**9.** Professors Wright and Miller define letters rogatory as

> *formal communications in writing sent by a court in which an action is pending to a court or judge of a foreign country requesting that the testimony of a witness resident within the jurisdiction of the latter court may be there formally taken under its direction and transmitted to the first court for use in the pending action.* Typically, the letter rogatory will be channelled through the United States State Department and the ministry of justice of the foreign country.

8 C. Wright & A. Miller, Federal Practice and Procedure § 2083, at 350 (1970) (footnote omitted).

that they were violating the law. Considered on the merits, the request sounds more in rhetoric than in substance. *See In re Vardjan,* 10 I. & N.Dec. at 572. Accordingly, with respect to the letters rogatory request, we find no abuse of discretion; *a fortiori,* we find no denial of due process.

### B.

 Petitioner's requested subpoena duces tecum sought FBI documents from the American Embassy in Mexico City. Petitioner alleged that FBI officials there had knowledge of and illegally participated in the persecution of political opponents of the Mexican government. The immigration judge determined that the FBI does have an interest in communist groups and individual communists, but he noted that petitioner's deportation charge is based upon his entry without inspection, under § 241(a)(2), and not under any other provision of § 241(a).[10] The judge concluded:

> If Respondent Marroquin's political activity has any relevance in these proceedings it is in the area of his claim to political persecution if returned to Mexico. At the most, in that area, the FBI reports could establish that Respondent Marroquin was politically active in Mexico. I find from the evidence of record that Mr. Marroquin was, at least, politically active in Mexico.
>
> I do not foresee the Department of Justice making public any classified documents because requested by an immigration judge. Nor do I see how, under the facts of this case, that the testimony of the FBI agent in charge in Mexico City is "essential" to a determination of this par-

ticular respondent's request for such subpoena.

Opinion at 45, *reprinted in* app. at 177–78. The immigration judge's refusal to issue a subpoena was a realistic determination and not an abuse of discretion nor a denial of due process.[11]

### V.

 Finally, petitioner contends that he should not have been found deportable on the grounds that he entered the United States without inspection and on a false claim of citizenship. The evidence, he argues, shows that he was stopped and taken into custody prior to entry, and thus never did "enter" the United States. Whatever the validity of petitioner's linguistic analysis, it is clear that he is precluded from offering it here. Petitioner pled guilty to charges under 8 U.S.C. § 1325 that he had entered the United States; therefore he is estopped from claiming now that he did not enter the country.

### VI.

The petition for review will be denied.

---

10. For example, this section provides for deportation of:

> Aliens who are members of or affiliated with ... (iv) the Communist or any other totalitarian party of any State of the United States, of any foreign state, or of any political or geographical subdivision of any foreign state; (v) any section, subsidiary, branch, affiliate, or subdivision of any such association or party; or (vi) the direct predecessors or successors of any such association or par-

ty, regardless of what name such group or organization may have used, may now bear, or may hereafter adopt....
8 U.S.C. § 1251(a)(6)(C).

11. In addition to the reasons set forth by the immigration judge, we note that petitioner had the benefit of the 50,000 FBI documents that his witness Rudenstein obtained under the Freedom of Information Act.