**Vivian C. ARUTA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 93–70981.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 15, 1995.

Decided April 10, 1996.

Joshua R. Floum, Heller, Ehrman, White & McAuliffe, San Francisco, California; Margaret R. O'Donnell, Mill Valley, California, for the petitioner.

Alexander H. Shapiro and Nelda C. Reyna, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: HUG, Chief Judge, ALARCON, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Vivian Calabio Aruta, a national and citizen of the Philippines, petitions for review of a Board of Immigration Appeal ("BIA") decision denying her applications for asylum and withholding of deportation. The BIA determined that her alleged fear of persecution was not objectively reasonable, and alternatively that she failed to demonstrate a threat of countrywide persecution.

We have jurisdiction over this timely petition pursuant to 8 U.S.C. § 1105a. We deny the petition in its entirety.

## I. BACKGROUND

### A.

Ms. Aruta entered the United States in February, 1985 on a tourist visa, which she subsequently overstayed. In July, 1988, on her own initiative, she applied for asylum. Two months later, the District Director at the San Francisco Immigration and Naturalization Service ("INS") denied her application. The INS commenced deportation proceedings in October, 1988 during which Ms. Aruta resubmitted her application for asylum, 8 U.S.C. § 1158(a), along with applications (1) for withholding of deportation as to the Philippines, 8 U.S.C. § 1253(h), and (2) for voluntary departure, 8 U.S.C. § 1254(e).

She bases her claim of asylum on an alleged fear of future persecution at the hands of two groups: the New People's Army ("NPA")-the military arm of the Communist Party of the Philippines which seeks to overthrow the Philippine government, and the Moro National Liberation Front ("MNLF")-a Muslim terrorist group dedicated to establishing an Islamic state on the island of Mindanao. Ms. Aruta's fear of persecution by these groups is solely and derivately based on her relationship with her father, who until 1977 was a police officer in Mindanao and who for 30 years was responsible for combatting the acknowledged terrorism of both groups.

In July, 1989 an immigration judge ("IJ") denied Ms. Aruta's applications for asylum and withholding of deportation, but granted her request for voluntary departure. Ms. Aruta appealed to the BIA the IJ's denial of her asylum and withholding of deportation claims.

The BIA denied Ms. Aruta's applications for asylum and withholding of deportation because it concluded that she failed to show that a reasonable person in her circumstances would fear persecution upon return to the Philippines, and that even if her fear were to be regarded as reasonable, the threat was not countrywide.

### B.

In addition to her own testimony supporting her applications, Ms. Aruta submitted background articles, newspaper clippings, a letter from her sister, and notarized and sworn certifications on her behalf from three Philippine officials: Captain Manolito B. Roliuqui, Commanding Officer and District IV Commander of the 482nd Philippine Constabulary; Attorney Jose V. Fontanoza, Mayor of Ipil; and the Barangay Captain of Don Andres.[1] She also presented declarations from two academic experts: Dr. Cesar Adib Majul, an authority on the Muslim movement in the Philippines, and Prof. James Anderson, a professor of social anthropology at the University of California at Berkeley and an expert in Filipino culture and society. Finally, she presented expert testimony in support of her application from David Saenz, an international security expert, current manager of international security at Levi Strauss & Co., attorney, and former FBI special agent. From this information, the following picture emerges.

Ms. Aruta grew up in the city of Ipil, located in the province of Zamboanga Del Sur on the island of Mindanao in the Philippines. Her father, Paolo Aruta, served for 30 years in the 482nd Battalion of the Philippine Constabulary stationed in southern Mindanao. He retired as a lieutenant in 1977. The Philippine Constabulary is equivalent to a military police force. Mr. Aruta's job included an assignment to quell the activities of the Muslim and communist insurgents operating in the area-the MNLF and the NPA.

Ms. Aruta lived with her family on Mindanao until 1977, when she moved to a nearby island, Cebu, to study at the university. She graduated in 1982 and returned to Mindanao in 1983 to work in an orphanage.

---

1. A barangay is like a neighborhood or borough. Don Andres is a barangay in the city of Ipil, where Ms. Aruta's father was on the local council. The barangay captain is the chief executive of the barangay.

Ms. Aruta and her family are Catholic but lived in an area dominated by a Muslim majority. Conflict between Muslims and Catholics in the area, which dates back to at least the seventeenth century, intensified during the Marcos regime. The MNLF is a Muslim secessionist group which seeks through force and violence to establish an autonomous Islamic state. Their activities are centered in Mindanao, but Ms. Aruta testified and submitted evidence that their subversive activities and violence are spreading to other islands of the Philippines as well.

Conflict between the government and the communists is another fact of life in the Philippines. The NPA is the military arm of the communist party. The NPA's goal is to overthrow the Philippine government and impose a communist regime. The NPA has strong support in southern Mindanao, as well as strong spheres of influence in regions throughout the Philippines. Mr. Saenz testified that the NPA is active in about 95% of the provinces in the Philippines.

The bitter conflicts between the NPA, the MNLF and the Philippine government remained acute during the Aquino administration notwithstanding the government's attempted overtures to the Muslim peoples and continued efforts to subdue the communist military forces.

Both the NPA and the MNLF have been known to seek out Philippine military, police and public officials for kidnapping, torture and assassination in pursuit of their political agendas. In addition, all three experts testified that both the NPA and the MNLF target innocent family members of such officials either to exact retribution against political enemies, or to deter officials from taking punitive actions against their organizations.

Mr. Aruta, Vivian Aruta's father, spent 30 years combatting these two groups. In 1970 he received a public commendation for his arrest of two local leaders of the MNLF. He also fought alongside the United States Marines and the Philippine army against the MNLF during the "Mindanao Crisis" of 1972, which led to the imposition of martial law in the Philippines. Mr. Aruta retired from the Constabulary in 1977—seven years before Ms. Aruta left the country-and was then elected to the city council.

As a result of his campaigns against the NPA and the MNLF and his later political activities, Mr. Aruta became well-known to both groups, such that threats against him and his family began to occur. Shortly after he received the public commendation in 1970, Muslims murdered Christian tenants who lived on the Arutas' land. Ms. Aruta testified that they were killed because of Mr. Aruta's well-known military activities against the MNLF. After the "Mindanao Crisis," around 1973, the Arutas began receiving death threats from both the MNLF and the NPA. Around 1974 or 1975, the family found a letter in the back yard that said that "our family is being traced by the MNLF so we better ... get out of the place." Around 1974, Ms. Aruta and her family temporarily left their home and went to another province, Misamis Occidental. In 1979 or 1980, while she was in Cebu and after her father's retirement from the Constabulary in 1977, a rock with a note attached was thrown into the family's house in Mindanao. The note was from the MNLF and said "you better leave or else your family will be killed." Mr. Aruta wrote to Aruta in Cebu several times telling her not to come home because it was too dangerous.

In 1987, the MNLF kidnapped her father at gunpoint. The MNLF released him after the Aquino government agreed to negotiate the MNLF's demands for an independent Islamic state. Sometime after that, Aruta's mother and father moved from their home in Ipil to Misamis Occidental. They now live in Germany.

### C.

None of this information paints a rosy picture of life in Mindanao. The problem, however, is that the picture is incomplete, and the missing part is significant in determining whether the record contains substantial evidence supporting the BIA's conclusion that Ms. Aruta's derivative fear of future persecution is not objectively reasonable.

First, Ms. Aruta herself has *never*, in Mindanao or elsewhere, been directly or indirect-

ly the victim of any threat, or of any acts of aggression, harassment, or persecution either by the NPA or the MNLF. In fact, after attending the University of Cebu from 1977 to 1983, she voluntarily returned to Mindanao, the alleged zone of danger, where she openly lived safely and without incident for two years before she decided in 1985 to leave the country. Notwithstanding the 1980 rock incident, nothing untoward happened to her during this important period to cause her to believe she was in danger of persecution.

Second, Ms. Aruta has a sister, Imelda. They share the same father and are thus identically situated in terms of the danger Ms. Aruta describes in her application and from which she seeks asylum. The record establishes that during the relevant time period, including the date the BIA rendered its decision, Imelda resided openly and continuously in Mindanao, the same zone of danger. Despite this exposure, Imelda was never harassed, threatened, hurt, or persecuted because of her father's activities. She did receive threats from the MNLF and the NPA, but these threats resulted from her own work with the Philippine Department of Social Services, not her relationship to her father. Ms. Aruta has done no such work.

Third, Aruta presented no direct or circumstantial evidence to the BIA that either feared group ever harmed or assassinated *any* specific member of any family because of that person's relationship to a *retired* official who had previously investigated them. We note again that Mr. Aruta's retirement as a police officer predated Ms. Aruta's departure by seven years.

## II. STANDARD OF REVIEW

 The BIA's decision whether to grant asylum is reviewed for abuse of discretion. *Berroteran–Melendez v. INS,* 955 F.2d 1251, 1255 (9th Cir.1992). Our inquiry is limited to a review of the administrative record. *See* 8 U.S.C. § 1105a(a)(4); *Gomez–Vigil v. INS,* 990 F.2d 1111, 1113 (9th Cir. 1993) ("We are not permitted to consider evidence that is not part of the administrative record."). Factual findings underlying the decision, including whether the alien has proved a well-founded fear of persecution,

are reviewed for substantial evidence. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). "Under this standard, a court must review 'the findings by a slightly stricter scrutiny than the clear error standard.'" *Shirazi–Parsa v. INS,* 14 F.3d 1424, 1427 (9th Cir.1994). The Board's factual findings "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. at 815 (quoting 8 U.S.C. § 1105a(a)(4)). The BIA's denial of asylum "can be reversed only if the evidence presented by [the alien] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* The Court added that such evidence must not only support such a conclusion, but "compel" it. *Id.* at 481 n. 1, 112 S.Ct. at 815 n. 1. Moreover, we do not reverse the BIA "simply because we disagree with its evaluation of the facts, but only if we conclude that the BIA's evaluation is not supported by substantial evidence." *DeValle v. INS,* 901 F.2d 787, 790 (9th Cir.1990) (quoting *Diaz–Escobar v. INS,* 782 F.2d 1488, 1493 (9th Cir.1986)). The BIA's decision whether to withhold deportation is also reviewed for substantial evidence. *Berroteran–Melendez,* 955 F.2d at 1255.

## III. ASYLUM

### A.

 To qualify for a discretionary grant of asylum under the Immigration & Nationality Act, 8 U.S.C. § 1158(a), an applicant must demonstrate that she is a "refugee." *INS v. Stevic,* 467 U.S. 407, 422 & n. 16, 104 S.Ct. 2489, 2496–97 & n. 16, 81 L.Ed.2d 321 (1984). The Act defines a "refugee" as an alien who "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [her country of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Eligibility for asylum rests on two alternate grounds: past persecution or well-founded fear of future

persecution. *Desir v. Ilchert,* 840 F.2d 723, 726 (9th Cir.1988).

The well-founded fear of future persecution standard has both an objective and a subjective component. To satisfy the subjective requirement, the applicant must demonstrate a genuine fear of future persecution. *Shirazi–Parsa,* 14 F.3d at 1427. To satisfy the objective requirement, the applicant must show "credible, direct, and specific evidence of facts supporting a reasonable fear of [future] persecution." *Id.* She need not show that persecution is "probable," only that it is a "reasonable possibility." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 440, 107 S.Ct. 1207, 1217, 94 L.Ed.2d 434 (1987) (quoting *Stevic,* 467 U.S. at 424–25, 104 S.Ct. at 2498).

### B.

Ms. Aruta bases her application for asylum on a claim of a well-founded fear of future persecution due to (1) her membership in a particular social group (her family), and (2) imputed political opinion (her father's). The BIA did not question Ms. Aruta's credibility or the genuineness of her fear. *See Damaize–Job v. INS,* 787 F.2d 1332, 1338 (9th Cir.1986) ("when the Board's decision is silent on the question of credibility, and the Board has fully explained the rationale behind its decision, we will presume that the Board found the petitioner credible"); *Platero–Cortez v. INS,* 804 F.2d 1127, 1131 (9th Cir.1986) (same). Nevertheless, in a thorough and well-reasoned decision, the BIA denied her petition because it concluded that Ms. Aruta had not established that a reasonable person in her circumstances would fear persecution by the NPA or the MNLF. We agree.

### 1. THE NPA

In its Decision, the BIA separately analyzed the potential for the future persecution of Ms. Aruta by each of the troublesome groups. As to the NPA, the Board looked first at documentary evidence, next at expert testimony, and then at the actual experiences of the Aruta family. As to its first inquiry, the Board concluded as follows:

[N]one of the documents indicate a policy of the NPA to target family members of these officials or officials who have retired from their positions. None of the documents provide an example of any family members or former official being assassinated by the NPA.... In sum, the documentary evidence provides no indication of individuals in circumstances similar to the respondent's having been targeted or harmed by the NPA, so as to establish a well-founded fear of persecution on this basis.

As to its second inquiry concerning experts and other declarants, the Board identified the very same deficiencies: no indication of a threat to a person in Ms. Aruta's situation, only to those directly involved in the conflict.

As to the Aruta family's own experiences with the NPA, the BIA's findings were consistent with and thus supportive of its analysis of both the expert and the documentary evidence:

Additionally, the respondent's own experiences and that of her family do not support a well-founded fear of harm by the NPA. Although the respondent's father apparently was responsible for combatting the NPA as well as the MNLF, the respondent's testimony and the documentary evidence only indicate specific actions against the MNLF. Additionally, the two death threats received by the respondent's father came from the MNLF, and not the NPA. At no time has the NPA indicated knowledge of the respondent's father or the respondent, or any inclination whatsoever to harm them. The evidence does reflect that the one sister of the respondent who has remained in the Philippines was on one occasion threatened by the NPA on the island of Mindanao, but this threat appears to have been motivated by her work as a government social worker, and not on account of her relationship to her father.

Adding all of this together, the Board concluded that "the respondent has not established that a reasonable person in her circumstances would fear persecution by the NPA if she were to return to the Philippines."

## 2. THE MNLF

We now turn to the Board's consideration of the MNLF where we find a similar picture. Once again, the documentary evidence and expert testimony fell short. As noted by the Board, "The documents submitted in the record do not indicate any particular instance where the MNLF has targeted or harmed former military, police, or government officials, or family members of current or former officials." The Board determined that the threats mentioned in that body of evidence were mostly speculative, and that the actual cases cited were not similar to the respondent's situation. The Board said, "[T]he circumstances of these individuals [cited as examples] appear markedly different from those of the respondent, the daughter of a former policeman and city council member, who herself had never been vocal in her opposition to the MNLF and had never undertaken any actions against the MNLF."

As to the family's actual experiences with the MNLF, the Board observed as follows:

The [IJ's] finding that the respondent does not have a well-founded fear of harm by the MNLF, following her father's retirement from both the police force and the city council, is supported by the fact that the respondent herself returned to the island of Mindanao following her university education in Cebu, even before her father's retirement, and was not harmed or threatened with harm during the almost two years she resided there before departing the Philippines. Additionally, her sister had remained in the island of Mindanao for many more years and has had no contact or difficulties with the MNLF whatsoever.

## C.

This case contains dispositive factors similar to considerations identified in *Mendez–Efrain v. INS*, 813 F.2d 279 (9th Cir.1987), as "substantial evidence" supporting the BIA's denial of a petition for asylum. *Id.* at 282–83. In favor of the BIA's decision in that case, we noted that similarly situated members of the petitioner's family continued to reside without incident on the family farm in the alleged zone of danger. As we had done in previous cases, we approved the use of such family evidence and the inferences drawn from it, stating that "it does substantially support the agency decision." *Id.* at 282; *see also Estrada v. INS*, 775 F.2d 1018, 1021–22 (9th Cir.1985) ("The absence of harassment of an alien's family tends to reduce the probability of persecution."); *Chavez v. INS*, 723 F.2d 1431, 1434 (9th Cir.1984) ("In addition, Lopez's family has remained in El Salvador and has not been harassed."); *Marroquin–Manriquez v. INS*, 699 F.2d 129, 134 (3d Cir.1983) ("We note the evidence that petitioner's family [which remained in Mexico and which included his wife who had similar political views] had not undergone threats, persecution, or harassment."). The evidence in this record regarding Ms. Aruta's sister Imelda falls squarely into this category. If anything, it more strongly supports the BIA's decision than in our other cases because of the parity in this context of the two sisters.

Moreover, we took pains to point out in *Mendez–Efrain* that the petitioner, although recruited by the military, was never himself "tortured, beaten, molested, harried, or ever threatened"; and that the petitioner failed to present any concrete evidence that anyone similarly situated had ever been harmed or threatened. 813 F.2d at 283. The same can be said on both counts for Ms. Aruta.

The BIA's decision here explicitly acknowledges that "so long as an objective situation [suggesting persecution] is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." *Cardoza–Fonseca*, 480 U.S. at 440, 107 S.Ct. at 1217 (quoting *Stevic*, 467 U.S. at 424–25, 104 S.Ct. at 2498). Therefore, we must decide whether the record contains substantial evidence that persecution is not a "reasonable possibility." Based on the evidence to which we have referred, we believe that it definitively does. Tested by the relevant standards, the Board's conclusions are both rational and fully supported by substantial evidence. In fact, we do not believe that a reasonable factfinder on this record could have concluded that Ms. Aruta's fear was objectively reason-

able. Certainly the evidence does not "compel" such a finding as required by *Elias–Zacarias*. To reiterate what we said in *Prasad v. INS*, 47 F.3d 336 (9th Cir.1995), a panel may reverse the BIA's asylum eligibility determination only if " 'the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.' " *Id.* at 338 (quoting *Elias–Zacarias*, 502 U.S. at 483–84, 112 S.Ct. at 817). The record conclusively demonstrates that Ms. Aruta's fear was not grounded in the reality of her situation either as of 1985, the year she left, or of July 10, 1989, the date of the IJ's decision. Thus, her fear is not "well-founded" as required by the statute.

Under the circumstances, the Board's alternative conclusion that the alleged threat is not countrywide is irrelevant.

### IV. WITHHOLDING OF DEPORTATION

 Withholding of deportation requires a higher standard of proof than asylum. The applicant must show a clear probability of persecution. The applicant must establish that it is "more likely than not that the alien will suffer persecution." *Elnager v. INS*, 930 F.2d 784, 786 (9th Cir.1991). Because Ms. Aruta did not satisfy the lesser standard required for asylum, perforce she fails to show an entitlement to withholding of deportation. *Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir.1995).

PETITION DENIED.

HUG, Chief Judge, dissenting.

I respectfully dissent.

The focus of this appeal is on the question of whether Vivian Aruta's fear of persecution is objectively reasonable, so as to qualify her for asylum. The BIA did not question her credibility or the genuineness of her subjective fear. On the basis of the very strong evidence presented from Aruta's family and knowledgable persons from the Philippines and experts on the Philippines, regarding the likelihood of persecution, it cannot be said that the fear she has is objectively unreasonable.

The BIA decision to deny Aruta asylum was also made on the grounds that she failed to demonstrate a country-wide threat. This court recently found that the existence of a threat of country-wide persecution is not required for determining eligibility for asylum or withholding of deportation. *Singh v. Ilchert*, 69 F.3d 375, 380 (9th Cir.1995). Because the BIA decision rested in part on impermissible grounds, the only issue remaining is the reasonableness of Ms. Aruta's fear.

I.

The facts stated by the majority reveal a good part of the reason for her fear. I add some other pertinent facts:

In addition to threats against her own family, Aruta testified to specific instances of violence against others to explain why she fears returning to the Philippines. She testified that in 1981 or 1982 a well-known Christian broadcast journalist who was critical of the MNLF fled from Mindanao to Cebu and then disappeared. Aruta believes, based on what she heard from others and what was reported in the press, that he was tracked down by the MNLF and murdered. On the basis of a newspaper report, she testified that in 1981–1982 a Christian politician from Mindanao took his family and fled to Toledo City, Cebu, where they were killed by the MNLF.

After Aruta's return to Mindanao from Cebu, her family continued to receive threats and Mr. Aruta advised his daughters to leave the country if they could.

Aruta's sister Imelda, who works for the Philippine Department of Social Services distributing food and supplies to military and civilian workers, has received written death threats from the NPA and MNLF against her and her family because she works for the government and gives out food and supplies to the military. In July 1987, Imelda wrote a letter to Aruta telling her that their family was not safe in the Philippines. She wrote,

> We are so much worried of Papa. He is being sought by the ... MNLF because he was one of those who made the military operation in Barangay Palid. Our father

now evacuated in Misamis Occidental. We plan to evacuate too with Mama and the kids.... We might be in Misamis Occidental next month and of course we will abandon everything here. Our life is not safe this time. They are watching on the family of military men.

After receiving her sister's letter, Aruta decided that it was not safe for her to return to the Philippines and she filed her application for asylum in 1988. In January, 1989, Brigadier General Eduardo Batalla and Colonel Romeo Abendan, two of Mr. Aruta's friends and superior officers, were kidnapped and executed. Sometime thereafter, Aruta's parents and two of her sisters fled, this time to Cologne, Germany, where they now live. At the time of the hearing before the IJ, Imelda was the only family member that remained in the Philippines.

## II.

I disagree with the BIA's denial of Aruta's asylum application. On the basis of the evidence in the administrative record, I must conclude that a reasonable fact finder would be compelled to find that Aruta's fear of persecution by both the NPA and the MNLF is reasonable and that the BIA's finding to the contrary is not supported by reasonable, substantial, and probative evidence. *See Elias–Zacarias*, 502 U.S. at 480–81, 112 S.Ct. at 815. Furthermore, I believe that the BIA erred in requiring Aruta to prove that she would be subject to persecution throughout the Philippines. While the geographic scope of the threat may in certain circumstances be relevant to a finding of whether petitioner's fear is well founded, it is not itself a legal prerequisite to a grant of asylum. *See Cuadras v. INS*, 910 F.2d 567, 571 n. 2 (9th Cir.1990). Even so, the record in this case does compel a finding that Aruta's fear that

the MNLF and the NPA could seek her out anywhere in the Philippines is reasonable.

### A. Reasonable Fear

In spite of the expert testimony and declarations, and in spite of Aruta's own credible testimony, the Board found insufficient evidence that either the MNLF or the NPA actually target either former officials or family of present or former officials. The Board accepted only that the MNLF and NPA target active duty officials. The Board discounted all the evidence to the contrary in the record because it found no "documented instances where this occurred."

In fact, there is substantial evidence in the record that the MNLF and NPA target family members of officials and retired officials, and no contrary evidence to support the BIA's conclusion that the MNLF and NPA target only active duty officials. For example, Dr. Cesar Adib Majul, a leading scholar of Muslim culture in the Philippines,[1] declared in reference to the NPA and MNLF,

> Threats against Mr. Paulo Aruta, the father of Miss Aruta probably stem from his role and actions against insurgents and secessionists while he was in active duty. *Revenge or retaliation against him can normally be extended to his innocent family members or near relatives.* This has not been an uncommon occurrence in the Philippines, especially in Mindanao. Such revenge or retaliation on innocent persons has been a technique utilized to deter members of the police or army forces from taking punitive actions against those fighting the established order.

(emphasis added).

Prof. James Anderson, professor of anthropology at University of California at Berkeley and former United States Marine,[2] declared,

1. Dr. Majul was professor of political science, Islamic studies, and philosophy at the University of the Philippines for eighteen years and has written numerous books and articles on Philippine and Islamic history, culture and politics.

2. Prof. Anderson studied social structure in Luzon from 1960 to 1962. He conducted further research visits to the Philippines at least ten

times between 1966 and the present. He served as a consultant for the Asian Development Institute and the Asian Institute of Technology. He was visiting Professor of Anthropology and Environmental Studies at the University of the Philippines from July 1977 to August 1979. He has also published numerous articles on the Philippines.

the fact that groups such as the MNLF and the NPA have made threats against the life of a *former* constabulary officer *and his family* is entirely likely.... I am aware that Philippine military and police officials recently have been tortured and/or assassinated by the NPA. I am also aware that MNLF and NPA members have targeted family members of these officials for kidnapping, torture and/or murder as a further means to exact retribution upon those they consider to be their political enemies.

(emphasis added.) Prof. Anderson also stated in his declaration, "The fact that her father and her family have received written death threats means that there is a real probability of a violent encounter should Ms. Aruta return to her native land." And he stated, "The fact that Dr. Majul, himself a Muslim, believes that the Muslim secessionist movement poses a threat to Ms. Aruta is strong unbiased evidence that the same is true."

Manolito Roliuqui, District IV Commander of the 482nd Constabulary, stated in a declaration, "while [Paulo Aruta] was in the active service in the Philippine Constabulary for thirty (30) years, he was one of those who actively campaigned against insurrection and rebellion, so that *upon his retirement,* his life *and that of his family* were the object of revenge by the rebels, proof of which he had received anonymous letters threatening to kill him and his family." (emphasis added). The Barangay Captain of Don Andres also testified in a declaration:

> *When said Lt. Aruta retired from the service, he and his family were object of reprisals by the rebels, thus endangering his life and that of his family.* This can be proven by many death threats he received from anonymous persons as well as some unsigned letters, for which reason, prompted Miss Vivian C. Aruta, one of his daughters to flee to the United States sometime in 1985, which was later on followed by her youngest sister, Miss Eliza Aruta to flee to Germany in mid 1987.

Ralph Saenz, former FBI special agent and current head of international security for Levi Strauss,[3] testified specifically that an *ex*-Philippine Constabulary official would be at risk. He described the risk to family members from the MNLF and NPA as part of a continuum. The risk from the MNLF is not as great as the risk from the NPA, and the risk to a family member is not as great as the risk to the politically active individual. He quickly added,

> That's not to say, however, that they would be immune from ... risk, because there have been instances in some of the provinces where threats have been made against family members of a particular policeman or police official or elected official with the idea through the family you send the message to the person.... I think most of us can probably understand we may be much more willing to accept risk if the risk is to us as opposed to where the risk is to our daughter or son or wife.

The Immigration Judge at the hearing posed the following hypothetical to Mr. Saenz:

> We have an individual who has clearly been a combatant, he has been in the Constabulary, he has fought against the NPA, he has fought against the MNLF, he is known presumably to both these organizations. As a matter of fact, one of them even had him as a hostage but let him go. Now he has a family member. That family member has not been in the Philippines since 1985. While she was in the Philippines other than the familial relationship she participated in no political activities that could be considered by the NPA or the MNLF as particularly heinous crimes against the people or against their organizations. Would you say in such a situation, Mr. Saenz, that there is a clear probability of a real likelihood that if the family member returned to the Philippines she would be targeted by either the NPA or the MNLF?

---

**3.** Mr. Saenz received a J.D. from University of California at Berkeley, worked for five years in counter-intelligence for the FBI, and for the past six years has been performing risk analysis for Levi Strauss' overseas operations. Levi Strauss has plants in the Philippines and employs Philippine nationals to work in those plants.

Mr. Saenz answered that, if Aruta were an employee of his company, he would recommend against sending her back to the Philippines because the risk would be unacceptable, even if she would have been a valuable employee in the Philippines. In answer to another hypothetical question, "would an ex-lieutenant of the Philippine Constabulary who had arrested several prominent MNLF leaders and who had participated ... in a battle against the MNLF and the NPA, would such a person be in danger of being targeted?" Mr. Saenz answered, "Oh, absolutely." (emphasis added).

Aruta herself testified that Mr. Aruta found the risk in the Philippines so great, even after his retirement from the Constabulary and the city council, that he took his wife and two of his daughters and fled to Germany. Mr. Saenz testified that the fact that the targeted official has left the country could actually put the remaining family members at even greater risk because it would be the only way to hurt the official, either for purposes of retribution or to serve as a deterrent to others.

In refusing to find Aruta's fear reasonable, the BIA ignored this very substantial and admittedly credible evidence establishing that Aruta will be at risk if returned to the Philippines, while highlighting certain specific pieces of evidence that it found irrelevant to her claim. For example, it discounted the death threats to Mr. Aruta and his family, and Mr. Aruta's kidnapping, because, according to the BIA, they occurred before his retirement. I do not see how the BIA could have drawn the conclusion that any events that occurred while Mr. Aruta was in the Constabulary or while he was a politician are irrelevant to Aruta's asylum claim now that he is retired. All the evidence in the record, including testimony and declarations from highly qualified experts and Philippine officials, clearly and without contradiction shows that ex-officials and their family members are at risk.

The BIA also found that Aruta's well-founded fear was undermined by the fact that Aruta returned to Mindanao after finishing college and lived there safely for two years, and by the fact that her sister had

remained in Mindanao unharmed at the time of the hearing (although she had received death threats from the NPA and MNLF). But the fact that Aruta escaped harm in the past does not make her fear of future harm unreasonable. See Damaize–Job, 787 F.2d at 1336 (fact that petitioner remained unharmed in Nicaragua for two years did not defeat his well-founded fear of returning). Actual past persecution is not required for asylum where the fear of future persecution is well founded, as it is here. Moreover, all evidence in the record points to the fact that the dangers have escalated since Aruta left the country, as evidenced by her father's kidnapping, the death threats to her sister, the executions of her father's superior officers, and the fact that most of her family fled the country. In addition, as Mr. Saenz testified, the fact that threatening letters may have stopped does not mean that the MNLF or NPA are no longer interested in targeting someone. He elaborated that, with respect to the NPA, while there are financial concerns and short term military setbacks that account for time delays, they have a long memory-as long as twenty years, and just because they have not acted against a target in a few years does not mean that person is not still in danger. He stated, "I think the NPA has not forgotten and that they still have things that they would want to have, you know, blood vengeance for. So the memory, the organizational memory of the NPA is actually quite long."

The BIA also discounted Aruta's fear that she would be persecuted by the NPA, in particular. Although acknowledging that Mr. Aruta had responsibility for combatting the NPA, it discounted the risk from this group because it found no evidence that Mr. Aruta took specific actions against the NPA or that he received threats from the NPA. And although her sister received death threats from the NPA, the BIA found that this was due to her activities as a government social worker, not her relationship to the family.

The evidence is clear, and the BIA does not deny, that in his 30 years in the Constabulary, Mr. Aruta combatted the NPA. He did not receive the same special commenda-

tion that he received for arresting two prominent MNLF leaders, but he fought against both groups for many years, and the declarations from his commanders attest to this fact.

Moreover, Aruta testified that her family received threats from the NPA as well as from the MNLF. As neither the BIA nor the IJ found this testimony incredible, we presume that it is true. *See Platero–Cortez,* 804 F.2d at 1131; *Damaize–Job,* 787 F.2d at 1338. In addition, the fact that Aruta's sister was threatened by the NPA augments, rather than diminishes, the reasonableness of Aruta's well-founded fear. As the Barangay Captain declared, "The eldest daughter . . . being connected with the Department of Social Services, a government agency, adds to the ire of the muslim rebels and the . . . NPA hence, their fear of being killed."

Furthermore, Mr. Saenz testified that the NPA will target a family member of an official for retribution if the official has committed an "extraordinary crime against the people." Mr. Saenz's testimony was based on a personal interview he had with the head of the NPA. Mr. Saenz clarified that by an "extraordinary crime against the people," the NPA leader "was referring to open armed conflict with units of the NPA." This is precisely the "crime" that Mr. Aruta committed. Thus, according to the NPA leader himself, it is likely that Mr. Aruta's family would be targeted for retribution by the NPA.

After reading her asylum application, Mr. Saenz was of the opinion that Aruta's fear of returning to the Philippines has a "real objective basis," and that it is "within the realm of possibility" that Aruta would be targeted for reprisals by the NPA if she returned to the Philippines. Prof. Anderson found her asylum application "perfectly credible, and [ ] entirely consistent with [his] knowledge of the political situation in the south Mindanao," and concluded that Aruta has a "well-founded and rational fear of persecution should she be deported to the Philippines." I conclude

that any reasonable fact finder would be compelled to agree. As Aruta's attorney so aptly put it at the hearing before the IJ, these "are events which would cause a rational person to be scared stiff." The BIA's conclusion that a reasonable person in Aruta's position would not share Aruta's fear is completely unfounded.

B. Aruta's Family

The majority relies on *Mendez–Efrain v. INS,* 813 F.2d 279 (9th Cir.1987) in deciding that the Aruta family's continued residence within the zone of danger is evidence of a reduced probability of persecution. Yet Aruta's parents and two of her sisters have fled to Germany. Her sister Imelda, who continued to live in Mindanao, received death threats against her own family from the MNLF and NPA. The situation is simply not comparable to that of *Mendez–Efrain* where, "Mendez's friends and family also continue[d] to live in El Salvador. They have never been harmed or threatened by the military." *Id.* at 283.[4] This court would send Aruta back to a country to be the sole member of her family still residing there.

Additionally, while petitioner in *Mendez–Efrain* was never "himself threatened," *id,* at 283, Aruta was threatened as a member of her father's family on several occasions. The two notes received by the Aruta family, one of which had a rock attached, stated that the entire family were at risk, again distinguishing this case from *Mendez–Efrain.*

Aruta is not a draft-dodger, nor are she and her family attempting to flee a life of poverty in the Philippines. Her family was financially comfortable and well-known in Ipil. They left because they feared for their safety. It seems to me that her fear, and the fear of her family, is objectively reasonable and supported by substantial evidence.

4. At oral argument petitioner's counsel stated that, subsequent to the filing of this appeal, Imelda also fled the Philippines. While the majority is correct in noting that our inquiry is limited to a review of the administrative record, in light of the fact that Imelda's continued residence in the zone of danger was a basis for a significant proportion of the majority opinion, her flight may serve as a basis for a motion to reopen.