Jin Shui QIU, Petitioner,

v.

John ASHCROFT, United States Department of Justice, Attorney General, Respondent.

Docket No. 00–4264.

United States Court of Appeals, Second Circuit.

Argued: Dec. 17, 2002.

Decided: April 16, 2003.

Bruno Joseph Bembi, Hempstead, NY, for Petitioner–Appellant.

Megan L. Brackney (Kathy S. Marks, Gideon A. Schor, on the brief), Assistant United States Attorneys, for Mary Jo White, United States Attorney for the

Southern District of New York, New York, NY, for Respondent–Appellee.

Before: CALABRESI, B.D. PARKER and RAGGI, Circuit Judges.

CALABRESI, Circuit Judge.

Petitioner Jin Shui Qiu seeks review of a November 30, 2000 decision of the Board of Immigration Appeals ("Board" or "BIA"), rejecting Qiu's appeal of an Immigration Judge's ("IJ") ruling, dated September 2, 1994. That ruling denied Qiu's application for asylum in the United States and for withholding of deportation to the People's Republic of China ("China"). Qiu had sought asylum and withholding of deportation principally on the ground that he and his family had suffered various indignities and injuries, among them the forced sterilization of his wife, under China's coercive program of population control. At the time of the IJ's decision, the Board did not recognize forced sterilization as a basis for asylum. *See Matter of Chang*, Int. Dec. No. 3107, 1989 WL 247513 (BIA May 12, 1989). Between the time of the IJ's decision and the BIA's consideration of Qiu's appeal, however, Congress amended the Immigration and Nationality Act to recognize such sterilization as a basis for asylum and for withholding of deportation. *See* Pub.L. No. 104–208, § 601(a)(1), 110 Stat. 3009–698 (1996) (now codified at 8 U.S.C. § 1101(a)(42)). Nonetheless the BIA declined to vacate or reverse the IJ's decision, holding that Qiu's testimony was too vague and insufficiently corroborated to meet his burden of proof.

We vacate the ruling of the BIA because its holding turns on (1) a mistaken assessment of what it means for testimony to be too "vague" to establish refugee status; (2) demands for corroborative evidence that are not properly explained; (3) factual determinations that are not supported by substantial evidence; and (4) a failure to consider important elements of Qiu's testimony. The case is remanded to the BIA, and the BIA is instructed to remand the matter to an IJ for a new hearing.

## I. BACKGROUND

### A. Qiu's Illegal Entry

Qiu, a citizen of China and former resident of Fujian Province, attempted to enter the United States illegally on December 29, 1992. He was intercepted by INS agents and, since he did not possess a valid, unexpired visa or travel document, he was charged with excludability under the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(7)(A)(i)(I), (B)(i)(I), and (B)(i)(II). The following April, Qiu, assisted by counsel, applied for asylum and for withholding of deportation. His hearing took place almost a year and a half later, on September 2, 1994.

### B. Proceedings Before the Immigration Judge

The hearing began with Qiu submitting into evidence a copy of his household registry, a certificate of sterilization, a fine payment receipt, English translations of these items, and, by way of background material, a New York Times article and a State Department report on China's birth control program, as carried out in Fujian Province. Speaking through an interpreter (who rendered Qiu's testimony into ungrammatical, hard-to-follow English), Qiu testified that he was born and raised in Fujian Province, and that he had received two-and-a-half years of formal education. He married his present wife in 1976, but, as the newlyweds were "too young," the authorities refused to register the marriage. Qiu's wife bore four children, the first two at the family's home in Fujian, the third in Tungto Town, and the fourth in Fuzhou. When Qiu's wife became preg-

nant with their third child, she and Qiu, fearing forced abortion and sterilization, fled to Tungto and hid there with his wife's family until the third child was born. Qiu found work in a garment factory, but was fired after his wife refused to abort the third child. Confronted by Qiu as to the reason for the dismissal, the head of the garment factory confirmed that Qiu's spouse's failure to report for an abortion was, in fact, the cause. He further stated that she would have to be sterilized for Qiu to reclaim his position.

Qiu then moved to Fuzhou, sixty kilometers from his home village, where he was able to secure manual employment. There, in 1985, his wife gave birth to their fourth child. After the birth, Qiu and his wife returned home, where his wife was arrested, "taken away by force," sterilized against her will, and then fined for violating birth control policies. Her captors consisted of "birth control officers," "committee members," and "brigade cadres." Qiu explained that the "birth control team" came through his village periodically, usually in October, demanding sterilizations. Up until 1985, Qiu and his wife had managed to evade the birth control team by going into hiding during the roundups. But they paid a price for their evasions. Qiu testified that the team would knock at his door and, finding no one home, would force their way in and "smash[ ] everything they can find into pieces." (It is not clear from Qiu's testimony whether this happened once or repeatedly.)

Qiu purported to corroborate his version of events with a sterilization certificate in his wife's name, dated October 15, 1985, and a receipt, dated October 30, 1985, for a 1000–yuan fine paid for violating China's "one-child limit." Additional support came from the State Department report, which indicated that China enforced its family size rules in Qiu's province with annual or biannual passes through the villages, much as Qiu had testified.

Two years after his wife's sterilization, Qiu made up his mind to leave China. A final incident prompted his departure: after a fire had swept through his neighborhood, destroying his and many other homes, Chinese officials gave most of the residents supplies sufficient to rebuild four-story structures, but Qiu received enough only for a two-story home, and he was relegated to a singularly poor building site. This mistreatment he attributed to his "family background." It is not clear what Qiu meant by "family background." At one point, he suggested that he was deprived of building materials because his father had cracked a joke about Mao back in 1966, for which his father had lost his position and had been forced to attend "study class." But Qiu also testified that in denying him building materials, local officials explained that they had to "take care of the lowest poor and lower peasants first." (Qiu characterized his family background as "rich peasant.")

Qiu finished presenting his case by explaining that were he sent back to China, he could be jailed or fined for leaving the country without the government's permission.

The INS attorney began his examination of Qiu by posing a number of questions about why Qiu chose to leave China and how he obtained passage to the United States. The attorney then had Qiu state for the record the amount of the fine paid for birth control violations. Qiu replied, "One thousand yuan, y-u-a-n." (The translation of the fine receipt submitted into evidence was denominated in dollars rather than yuan.) Except for clarifying the amount of the fine, the INS attorney did not try to elicit details about Qiu's experiences under China's birth control policies. The attorney did ask for proof of Qiu's

marriage; there followed a partially off-the-record exchange about the household registry that Qiu had submitted into evidence, which seems to have allayed the attorney's doubts. That was the extent of INS questioning.

The IJ then posed a question of his own. He observed that the 1993 household registry showed only three children and asked Qiu to explain the discrepancy. Qiu said that "last year" (i.e., in 1993) he had listed his eldest child in his brother's household registry, apparently hoping that this would lead public authorities to believe him to have only three children. Even so, Qiu's family suffered for its size. Thus, prompted by his attorney, Qiu indicated that Chinese officials had refused to place a seal on the youngest child's entry in the 1993 household registry, because Qiu had "too many" children. This prevented Qiu's youngest child from attending school and deprived that child of food rations. The IJ then asked a few questions about Qiu's sister, who was listed in the registry but without a seal; about Qiu's father's treatment as a political prisoner; and about local officials' explanation for Qiu's allotment of building materials following the 1987 fire. Like the INS attorney, the Immigration Judge did not try to elicit details about the application of China's population laws to Qiu and his family.

### C. The Immigration Judge's Decision

After concluding his questioning and confirming that the attorneys for Qiu and the INS had nothing further to add, the IJ recited his ruling from the bench. He explained that Qiu had failed to show either past persecution or a "reasonable fear" of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, and therefore was not eligible for asylum. (*A fortiori*, Qiu could not show the higher "clear probability" of impending persecution requisite to a withholding of deportation.) The IJ considered and rejected three possible bases for asylum: the events of 1966 (relating to Qiu's father's troubles), Qiu's fear of punishment for having left China illegally, and the misfortunes suffered by Qiu and his wife due to China's population-control policies.

First, the judge held that Qiu could not show a "proper nexus" between his father's quip about Mao and any subsequent adversities. Qiu had not drawn into doubt the official explanation that his allocation of building materials after the fire reflected his "rich peasant" family background.

As for Qiu's stated fear of future persecution for leaving China illegally, the court held that under *Matter of Nagy*, 11 I. & N. Dec. 888, 1966 WL 14392 (BIA 1966), such punishment is prosecution, not persecution, unless the defendant is "singled out for more severe treatment," an eventuality in support of which Qiu did not testify.

Finally, the judge found incredible Qiu's testimony about his family size and forced sterilization. Qiu's testimony regarding the circumstances of his wife's arrest and forced sterilization was not "sufficiently detailed to be worthy of belief," and, further, the certificate of sterilization that Qiu had submitted into evidence was "not properly authenticated or sufficient to make a finding of a forced sterilization." Even if the certificate were authentic, the judge continued, it would only show that Qiu's wife had been sterilized, and (according to the State Department) many Chinese mothers opted voluntarily for sterilization, in exchange for benefits from the government.

As to family size, the IJ noted an apparent inconsistency between Qiu's account of what had happened to him and the State Department's report on practices in rural

China. According to the State Department, the IJ said, two children are allowed without fines in rural areas. But, the judge reasoned, if Qiu had hidden the identity of his first child from the government, then following the birth of his third child, the government would have thought him to have only two children, and therefore would not have imposed a fine.

In closing, the IJ invoked *Matter of Chang*, Int. Dec. No. 3107, 1989 WL 247513 (BIA 1989), which held that an individual claiming asylum on account of the one-couple, one-child policy must establish that the application of the policy to him was persecutive on its face, or that he has a well-founded fear that he would be persecuted due to selective application of the policy to religious groups, or to punish political opinions, etc. The judge observed that Qiu had not shown that he had been singled out on some illicit ground, or punished for publicly opposing the policy.[1]

### D. Events Following the Immigration Judge's Decision

On September 9, 1994, a week after the IJ's ruling, Qiu filed a notice of appeal to the BIA. The notice identified two grounds for the appeal: first, that the IJ's decision was not backed by substantial evidence; and, second, that the IJ had relied on an "incorrect legal standard"—that of *Matter of Chang*, a decision said to have been overruled by various executive orders and administrative rules. Qiu's November 1994 appellate brief focused on the status of *Matter of Chang*, and argued that individuals harmed by coercive family plan-

ning policies are per-se eligible for asylum on account of political opinion. The government's brief, dated December 1994, sought summary dismissal under *Matter of Chang* or, in the alternative, affirmance on the ground that substantial evidence supported the IJ's decision.

Several months after the parties filed their briefs with the BIA, we decided *Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995), in which we considered and rejected the argument that *Matter of Chang* had been superseded by statute, executive order, or administrative decision. But, in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), section § 601(a)(1) of which amends the immigration laws to make the nondiscriminatory application of coercive population controls a legal basis for asylum and for withholding of deportation. *See* Pub.L. No. 104–208, § 601(a)(1), 110 Stat. 3009–698 (1996) (current version at 8 U.S.C. § 1101(a)(42)).

Long after this change in the law, on November 30, 2000, the BIA issued its rejection of Qiu's appeal.

### E. The BIA's Decision

■ The BIA ruled that substantial evidence supported the IJ's decision. In so holding, the BIA did not accept the IJ's characterization of Qiu's hearing testimony as incredible. To the contrary, it criticized that conclusion, but also stated that Qiu's testimony (presumably, even if credible) was insufficiently detailed to satisfy his burden of proof.[2]

---

1. It is not clear that the discussion of *Matter of Chang* was necessary to the IJ's holding, however, since the opinion earlier discredits Qiu's testimony regarding his family's suffering under China's population control program.

2. This distinction is important to our review of Qiu's appeal, for while we generally defer to an IJ's factual finding regarding witness credibility, *see Montero v. INS*, 124 F.3d 381, 386 (2d Cir.1997), we review de novo the question of law regarding what evidence will suffice to carry an asylum applicant's burden

Two sets of events that might be thought to comprise past persecution within the meaning of the Immigration and Nationality Act, as revised by the IIRIRA, were considered and rejected: the threats of forced abortion and sterilization that, Qiu avers, caused him and his wife to flee to Tungto during her third pregnancy; and the allegedly forced sterilization of Qiu's wife—together with the fine—following the birth of their fourth child. The first event the BIA called into doubt because of Qiu's registration of his first child on his brother's household registry. "[I]f the first child was registered with the applicant's brother," reads the opinion, "then in 1981 during the pregnancy and birth of the third child the government would have only been aware of two of the applicant's children which, according to the applicant, was acceptable, and his wife would not have been sought for an abortion or sterilization at that time." As for the forced sterilization, the BIA simply stated that "the evidence does not establish that the applicant's wife was forced to have the operation against her will." Though she was fined soon thereafter, "the fact that the fine assessed was stated in terms of dollars instead of Chinese currency raises doubts as to its authenticity." Summing up, the BIA concluded that "the applicant's general and vague testimony regarding his alleged persecution was not remedied by a showing of specific and detailed corroborative evidence."

### F. The Arguments on Appeal from the BIA's Decision

Qiu proposes three grounds for this Court to vacate or reverse the decision of the Board. First, he claims that the Board's decision violates due process, in that the Board failed to remand the case to the IJ for additional fact-finding in light of the IIRIRA's new basis for refugee status. (At oral argument, Qiu's attorney conceded that our recent decision in *Guan Shan Liao v. U.S. Dept. of Justice*, 293 F.3d 61 (2d Cir.2002) precludes this line of attack, on the facts of the present case. Therefore we will not further consider the due-process theory.) Second, Qiu argues that the Board's decision must fail because the Board unreasonably demanded corroborative evidence and specific testimony, and because the Board's decision was not supported by substantial evidence in the record as a whole. Third, Qiu suggests that the Immigration Judge violated a duty to help him develop his case, and that because neither the IJ nor the attorney representing the INS probed into or cast doubt upon Qiu's statements regarding the adversities that he and his family suffered in China, those statements must be taken as true.

The INS maintains that substantial evidence supports the Board's rejection of Qiu's testimony as unacceptably vague and as lacking in corroboration; that the Board's decision not to remand in light of the IIRIRA did not violate due process; and that neither the INS attorney nor the IJ had any obligation to assist Qiu in developing his case.

For the reasons stated below, we vacate the BIA's decision and remand with instructions that the BIA, in turn, remand Qiu's case to an IJ for another hearing.[3]

## II. DISCUSSION

### A. Legal Protections for Refugees

 United States law extends two forms of relief to refugees: asylum and

---

of proof. *See generally Guan Shan Liao v. United States*, 293 F.3d 61, 66 (2d Cir.2002).

**3.** At oral argument both parties agreed that, were we to vacate the decision, a remand to an IJ would be in order, given both the considerable passage of time since the original hearing and the intervening change in the law.

withholding of deportation. Associated with each is a different burden of proof, which in both cases is borne by the applicant. *See Diallo v. INS,* 232 F.3d 279, 285 (2d Cir.2000). It is easier to establish eligibility for asylum, but the power to grant asylum to eligible aliens is discretionary, and reserved to the Attorney General. *See id.;* 8 U.S.C. § 1158(b). By contrast, the Attorney General must withhold the deportation of an alien who passes the stricter test for this form of relief. *See Diallo,* 232 F.3d at 285.

■ To establish eligibility for asylum, a petitioner must show that he is a "refugee" within the meaning of the Immigration and Nationality Act, i.e., that he has suffered past persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion," or that he has a well-founded fear of future persecution on these grounds. *See* 8 U.S.C. § 1101(a)(42); *Diallo,* 232 F.3d at 284. A showing of past persecution sets up a rebuttable presumption of a well-founded fear of future persecution, which is overcome only if "a preponderance of the evidence establishes that a change in circumstances in the applicant's country of nationality has occurred such that the applicant's fear is no longer well-founded." *Guan Shan Liao,* 293 F.3d at 67 (citing 8 C.F.R. § 208.13(b)(1)(i)).

■ To be entitled to a withholding of deportation, the refugee must further establish that it is more likely than not that, were he deported, his "life or freedom would be threatened" on account of one of the privileged grounds mentioned above. *See* 8 U.S.C. § 1231(b)(3)(A); *Diallo,* 232 F.3d at 284–85. Again, a showing of past persecution threatening life or freedom creates a presumption of threats to life and freedom upon return. This presumption is overcome only if "a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there." *Diallo,* 232 F.3d at 285 (quoting 8 C.F.R. § 208.16(b)(2)).

In 1996, Congress augmented the definition of "refugee" as follows:

■ [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and

■ a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

IIRIRA § 601(a), codified at 8 U.S.C. § 1101(a)(42).

Soon thereafter, the BIA ruled (i) that a male applicant for asylum may "stand in his wife's shoes" and apply for asylum based on her forced abortion or sterilization, (ii) that the presumption of future persecution following such imposed medical procedures cannot be rebutted absent changed country conditions, and (iii) that forced sterilization or abortion threatens the "life or freedom" of the victim, and thus, absent changed country conditions, entitles her—or her spouse—to a withholding of deportation. *In re C–Y–Z–,* 21 I. & N. Dec. 915, 1997 WL 353222 (BIA June 4, 1997).

## B. Standard of Review

■ We will uphold the BIA's factual findings if they are based upon "substantial evidence." *See Diallo,* 232 F.3d at

287. Substantial evidence review in the immigration context is "slightly stricter" than the clear-error standard that the circuit courts typically apply in reviewing a district court's factual findings, yet we will "not reverse the BIA simply because we disagree with its evaluation of the facts." *Aruta v. INS*, 80 F.3d 1389, 1393 (9th Cir.1996) (internal quotation omitted). Rather, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *accord Guan Shan Liao*, 293 F.3d at 66.

▮ Moreover, we accord *Chevron*-style deference to BIA interpretations of law insofar as the BIA's statutory construction reflects a judgment that is peculiarly within the BIA's expertise. *See generally Iavorski v. INS*, 232 F.3d 124, 133 (2d Cir.2000) (differentiating between "pure" questions of law, which courts are as well positioned as the agency to decide, and questions that implicate the agency's special competence, where *Chevron* deference is due). And, whether or not the BIA's construction of a statute receives *Chevron* deference, we review de novo the BIA's *application* of its statutory construction. *See Diallo*, 232 F.3d at 287; *Alvarado–Carillo v. INS*, 251 F.3d 44, 49 (2d Cir.2001).

▮ Rules of law circumscribe the evidence that the BIA may demand and the inferences that it may draw in finding facts, and require the BIA to elucidate the basis for its factual conclusions. *See, e.g., Diallo*, 232 F.3d at 285–287 (vacating a decision because the BIA failed to explain why its demand for corroborative evidence was reasonable); *Anderson v. McElroy*, 953 F.2d 803, 806 (2d Cir.1992) ("[W]e cannot assume that the BIA considered factors that it failed to mention in its decision."). We excuse BIA decisions that fail to consider all factual assertions in an applicant's claim for eligibility only where the evidence in support of a factor potentially giving rise to eligibility is "too insignificant to merit discussion." *See Guan Shan Liao*, 293 F.3d at 68, *quoting Douglas v. INS*, 28 F.3d 241, 244 (2d Cir.1994).

▮ Thus, while we have said that on substantial evidence review, we will *"reverse* [the BIA] only if no reasonable fact-finder could have failed to find the past persecution or fear of future persecution necessary to sustain the petitioner's burden," *Diallo*, 232 F.3d at 287 (emphasis added), it is also true that we will *vacate* BIA conclusions, as to the existence or likelihood of persecution, that a perfectly reasonable fact-finder *could* have settled upon, insofar as the BIA either has not applied the law correctly, or has not supported its findings with record evidence. BIA errors of law are not excused by the fact that a hypothetical adjudicator, applying the law correctly, might also have denied the petition for asylum, nor can factual findings supporting such a denial be assumed on the basis of record evidence not relied on by the BIA.

### C. The BIA's Decision, Analyzed[4]

The BIA's disposition of Qiu's appeal illustrates the full range of errors we have

---

4. We consider only the BIA's findings regarding past persecution, and only with respect to China's population control program. This is the decisive issue in the case before us. The government has not made a "changed country conditions" argument to this court. Neither did the BIA's decision advert to such an argument. Therefore, if the BIA erred in finding that Qiu failed to carry his initial burden with respect to past persecution, we cannot affirm the BIA's decision (for the presumption created by such a showing of past persecution has not been rebutted). *See Matter of C–Y–Z–*, 21 I. & N. Dec. 915, 1997 WL 353222 (BIA 1997). On the other hand, we agree with the IJ, substantially for the reasons

just discussed. There are pivotal factual determinations that no reasonable finder of fact would have made, there are failures to consider the record as a whole, and there are unreasonable and under-explained demands for greater testimonial specificity and corroboration. We begin by quoting the decisive portion of the BIA's opinion virtually in its entirety:

> Specific, detailed, and credible testimony, or a combination of detailed testimony and corroborative background evidence, is necessary to prove a case for asylum. In the instant case, the applicant was unable to provide specifics regarding many of the elements central to his asylum claim. For example, the testimony as to the sterilization of his wife was generalized and lacked sufficient detail. Moreover, the testimony regarding the registry of his children was unclear.... As the [IJ] points out, if the first child was registered with the applicant's brother, then in 1981 during the pregnancy and birth of the third child the government would only have been aware of two of the applicant's children which, according to the applicant, was acceptable, and his wife would not have been sought for an abortion or sterilization at that time. Although the applicant testified that he registered his oldest son with his brother in 1993 ... it is unclear whether he had also done so on prior registries.... If he had not registered his first son with his brother before 1993, it is unclear how all four could have been registered previously without a problem.

> The weaker an applicant's testimony, the greater the need for corroborative evidence. However, the applicant in the

instant case has failed to provide such evidence. Specifically, we note that the applicant did not submit copies of birth certificates for any of his children [or] a copy of his brother's household registry listing his first-born son. Moreover, we note that the applicant has provided a copy of a Certificate of Sterilization, ... [but] the evidence does not establish that the applicant's wife was forced to have the operation against her will. Finally, although the applicant provided a copy of the fine receipt, ... the fact that the fine assessed was stated in terms of dollars instead of Chinese currency raises doubts as to its authenticity and requires, at the very least, an explanation.

1. Improper Demands for Additional Testimonial "Specificity"

 It is and must be the case that, as the BIA's decision supposes, the petitioner whose testimony is vague can only qualify for asylum if he produces evidence that adds a certain amount of detail to his story. Our decision in *Guan Shan Liao* illustrates the point:

> Liao testified he left his home because his neighbor informed him that "two persons from the community" were looking for him. Yet, he did not indicate who these persons were or what they would have done had they found him and his family. Thus, [Liao's claim (that he was "forced to leave his village and deprived of valuable government services" because he "harbored a cousin who was wanted for sterilization")] is conjectural.

> Petitioner also declares in his brief that after his family left the house, it was destroyed. But ... even assuming

he stated, (1) that, without recourse to the rebuttable presumption created by a showing of past persecution, Qiu has not independently shown a well-founded fear of future perse-

cution, and (2) that Qiu has not established past persecution on account of his father's joke about Mao.

Liao's house was damaged, we do not know that this loss was attributable to the government because he only vaguely identified the two persons he believes were looking for him and whom he blames for having to vacate his home. *Guan Shan Liao,* 293 F.3d at 70 (internal citations removed).

■ Implicit in this passage is a logical interpretation of what can make credible testimony nonetheless "too vague" to establish refugee status, absent gap-filling evidence. Thus, testimony is "too vague" if it doesn't identify facts corresponding to each of the elements of one of the "refugee" categories of the immigration statutes, as interpreted by the BIA and the federal courts. The IIRIRA's special statutory presumption of persecution on account of political opinion applies only to "person[s] who [have] been forced to abort a pregnancy or to undergo involuntarily sterilization, or who [have] been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42). Because Liao did not identify as government officials (or other agents of China's population control program) the persons who allegedly damaged his home, his testimony, even taken as true in all its particulars, does not support an inference that he was persecuted for resistance to that program.

■ By contrast, Qiu testified that his wife was apprehended for sterilization by "birth control officers," "committee members," and "brigade cadres." Asked whether his wife wanted to be sterilized, Qiu replied, "No. She was taken away by force." This is not detailed testimony, but neither is it "vague." It is specific as to the following essential facts: (a) that his wife was forced to be sterilized against her will, and (b) that the agents of coercion were government birth control officials,

from which it follows, absent contrary evidence, that they were acting to advance China's population control policy. This is enough specificity to bring Qiu's wife within the ambit of the IIRIRA's regulatory presumption of persecution on account of political opinion, and, under *In re C–Y–Z–,* it suffices for Qiu as well.

The BIA's decision below and the government's brief on appeal blur the distinction between testimony that adverts (albeit not in great detail) to facts corresponding to the definitional elements of "refugee," and testimony, as in *Guan Shan Liao,* that fails to make out these elements. Thus, the government's brief faults Qiu for not "describ[ing] the details of the [sterilization] incident, such as how and when his wife was arrested, how many officials were involved, where she was taken, how long she was detained, or what type of sterilization procedure she underwent." Br. of Respondent–Appellee, at 22–23. But, none of these "details" affects whether the sterilization entitles Qiu to refugee status.

A forced sterilization, undertaken to advance a program of population control, can be effected by one arresting official or ten; with an arrest in the morning or in the evening, in the rain or in the sunshine; with a detention for no longer than the time it takes to perform the surgery, or a detention for a term of years; with a tubal litigation operation or a hysterectomy. And since the list of circumstantial details can be expanded indefinitely, a legal standard that empowers an IJ or the BIA to rule against a petitioner who fails to anticipate the particular set of details that the fact-finder desires (but does not request, through questions directed to the applicant) is no standard at all. It would enable the administrative decisionmaker to reject whichever applicants that fact-finder

happens to disfavor.[5]

This is not to say that incidental detail has no role in asylum proceedings. Where an applicant gives very spare testimony, as here, the IJ or the INS may fairly wonder whether the testimony is fabricated. *Cf. Diallo*, 232 F.3d at 284 n. 3 (remarking that testimony which is credible, in the sense of being internally consistent, may nonetheless appear implausible). If so, the IJ and counsel for the INS may wish to probe for incidental details, seeking to draw out inconsistencies that would support a finding of lack of credibility. But

that is not what happened during Qiu's hearing.[6] Neither the IJ nor counsel for the INS questioned Qiu about the "details of the sterilization incident."[7] And, indeed, the BIA expressly found no reason to deem Qiu incredible.

We conclude that the BIA erred in denying asylum on the basis of insufficient testimonial specificity. And, because the BIA misapprehended what it means for testimony to be too "vague" to support refugee status, the Board's decision must be vacated and remanded[8]—provided, of

5. In this respect, denying refugee status on the basis of the petitioner's failure to testify to a given set of circumstantial details (which the adjudicative body identifies only ex post), notwithstanding the petitioner's specific and credible assertion of facts that, if true, qualify him as a refugee, is markedly different from denying refugee status on the basis of the petitioner's failure to produce specific pieces of documentation that (a) have been identified by the IJ or INS, (b) have been shown by the government to be reasonably available to the petitioner, and (c) would corroborate, or undermine, the petitioner's testimony. *Diallo* acknowledges that, in some instances, the BIA may refuse refugee status due to the petitioner's failure to furnish such documentation, notwithstanding the petitioner's (internally consistent) testimonial account of the events said to qualify him for asylum. *See Diallo*, 232 F.3d at 285–90; *see also* Part II.C.2, *infra*.

6. We have no occasion to say whether such questioning is necessary to a finding of lack of credibility in spare testimony cases. We simply note that, according to BIA precedent, incredibility arises from "inconsistent statements, contradictory evidence, and inherently improbable testimony." *Diallo*, 232 F.3d at 287–88 (discussing BIA decisions). Thus, if the INS or IJ has nagging doubts about an applicant's credibility due to the spareness of her testimony—a factor that the BIA, to date, appears not to have expressly recognized as a basis for a finding of incredibility—it would seem prudent for the INS or IJ to pose questions aimed at eliciting inconsistent or inherently implausible statements.

7. Of course, neither the IJ nor the INS had much reason to challenge Qiu's testimony regarding coercive population control, since at the time of the hearing, that was not a basis for refugee status. On remand, the INS and IJ will have ample incentive to do so.

8. We do not today need to decide whether, as a general matter in other cases of "spare testimony," the appropriate remedy is (a) to vacate and remand the BIA decision for a new fact-finding hearing, at which the IJ may pose questions and seek corroborative evidence that would support a finding of incredibility; or (b) to reverse the BIA's decision and hold the petitioner eligible for asylum, etc., on the ground that the petitioner's version of the facts, as presented at the initial hearing, is decisive (notwithstanding the possible unexplored doubts about credibility). Vacatur is clearly appropriate in the case before us (assuming that there does not exist an independent ground for affirming the BIA's decision). This is so given the passage of time and change in the law since Qiu's initial hearing. In this respect we note that, under the controlling standard at the time of that hearing, forced sterilization was not a basis for refugee status. And that, by itself, may explain the failure to question Qiu's testimony about sterilization. *Cf. Zhao v. United States*, 265 F.3d 83, 95–96 (2d Cir.2001) (holding that the BIA abused its discretion in denying the Chinese petitioner's motion for rehearing based on new evidence of the petitioner's wife's sterility, because "the relevance of [the evidence] would not have been known at the time of petitioner's exclusion hearing," which predated the IIRIRA and *In re C–Y–Z–*). Further-

course, that there are not independent grounds for denying asylum. We consider next whether such grounds exist in this case.

## 2. The Corroborative Evidence Requirement

■ The BIA apparently denied Qiu's application not only because Qiu gave supposedly "vague" testimony, but also because Qiu did not produce sufficient corroborative evidence. This raises the question of whether the alleged shortfall of "corroborative evidence" constitutes an independent ground on which we can affirm the BIA's decision.

■ Our decision in *Diallo* states that an immigration judge has the authority to deny eligibility for asylum in some cases where the applicant has failed to provide certain corroborative documents, even though the applicant testified credibly to facts that, if true, would qualify her for refugee status. *See supra* note 5. But *Diallo* also strictly limits the application of this authority. Thus, *Diallo* holds that to turn down a refugee candidate for want of sufficient corroboration, the adjudicator must (a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner. *See Diallo,* 232 F.3d at 285–90; *see also Alvarado–Carillo,* 251 F.3d at 54–55 ("[T]he BIA here did not identify any particular document or type of document it believed to be missing from the record (as it did in *Diallo* ), much less explain why it would have been reasonable to expect the provi-

sion of such materials …") (internal quotation marks omitted). Given these requirements, we cannot affirm the BIA's decision.[9]

In denying Qiu's petition, the BIA listed the following as "missing" pieces of evidence: "birth certificates for … his children," "a copy of his brother's household registry listing his first-born son," and unspecified evidence that would have shown that Qiu's wife "was forced to have the operation against her will." But under *Diallo* and *Alvarado–Carillo,* the IJ and BIA had no leeway to deny Qiu's application without first (a) pointing to specific pieces of missing, relevant documentation, and (b) showing that this documentation was reasonably available to Qiu. *See Diallo,* 232 F.3d at 290; *Alvarado–Carillo,* 251 F.3d at 54–55. This was not done. The BIA's ruling did not establish the availability (to Qiu) of the desired paperwork, and, as to the "forcedness" of Qiu's wife's sterilization, it did not even indicate what sort of evidence would have served to corroborate the coercion.

These gaps are enough to settle the case before us. Nevertheless, the reasons for *Diallo* 's requirements are worth restating. Unless the BIA anchors its demands for corroboration to evidence which indicates what the petitioner can reasonably be expected to provide, there is a serious risk that unreasonable demands will inadvertently be made. What is "reasonably available" differs among societies and, given the widely varied and sometimes terrifying circumstances under which refugees flee their homelands, from one asylum seeker to the next.

more, the parties at oral argument agreed that if a vacatur were deemed appropriate, a new hearing before an IJ would be the proper disposition.

**9.** *Diallo* does not address the question of whether the petitioner must be given *prior* notice of the need for such documentary cor-

roboration. Because, in the case before us, *Diallo* 's requirements were not met in any event, we need not now decide whether the notice *Diallo* mandates must be given before the BIA's or IJ's ruling, and at a time when the applicant can still submit the specified documents for review by the appropriate decisionmaker.

Consider in this regard the BIA's statement that Qiu should have produced his children's birth certificates. That seems only natural to the jurist in an affluent, Western society, with advanced systems of record-keeping, in which most every child is born in a hospital, and in which citizens may retrieve their "files" from the state. What is (subjectively) natural to demand may not, however, be (objectively) reasonable. As for Chinese birth control certificates, the BIA points to nothing that even suggests the existence of such documents, let alone their prevalence, or their accessibility to asylum seekers.[10]

*Diallo*'s requirement that the BIA back its demands for corroborative evidence with a reasoned explanation—an explanation that responds to evidence of actual conditions in the asylum-seeker's former country of residence—constitutes one small, but crucial, defense against potentially mistaken, culturally based assumptions about the existence and availability of documents.[11]

### 3. Substantial Evidence and the "Whole Record"

The BIA's mistaken analyses of "vagueness" and corroboration represent sufficient grounds for us to vacate the BIA's order and remand this case for a new hearing. In the interest of judicial economy, given our remand, we will, however, also address other ways in which the BIA decision ran afoul of our Circuit's immigration-law precedents.

### a. *Substantial Evidence*

■ The BIA's decision depended on some "factual" determinations that are not

---

**10.** Of course we are not saying that it is unreasonable to demand birth control certificates from Chinese petitioners. It may be the case that such documentation is widely available in China, or at least in certain Chinese provinces. But the BIA's opinion does nothing to establish that this is so.

**11.** Since we hold that the BIA misapplied *Diallo*'s corroborative evidence rule, we need not delve into the question of when or whether the BIA may reject an application for want of corroborative evidence, notwithstanding a finding that the petitioner was credible. A certain tension in our precedents on this point should, however, be acknowledged. In *Diallo*, we treated as permissible a BIA-established standard under which, it appears, the IJ could condition refugee status on the proffering of corroborative evidence even if the petitioner has testified credibly as to conditions that at face value qualify her for that status. *See Diallo*, 232 F.3d at 285–86 (suggesting that such evidence may be needed to meet the petitioner's burden of proof). And *Diallo* expressly rejected the Ninth Circuit's rule, by which "credible testimony is automatically sufficient and renders corroborating evidence unnecessary." *Id.* at 286 (citing *Cordon–Garcia v. INS*, 204 F.3d 985, 992 (9th Cir.2000), which reaffirmed the Ninth Cir-

cuit's longstanding position). *Abankwah v. INS*, 185 F.3d 18 (2d Cir.1999), decided just a year before *Diallo*, instead tracked the logic of the Ninth Circuit cases. In *Abankwah*, the BIA had found the petitioner's testimony (as to female genital mutilation [FGM] in her home village) credible and sufficient to establish her subjective fear of persecution. Nevertheless, the BIA held that more corroborative evidence was required to establish the objective reasonableness of her fear. *Id.* at 24. On appeal, we rejected the latter contention. "Having established that Abankwah is credible," we reasoned, "we accept as fact her assertion that Nkumssa custom includes FGM as a punishment for premarital sex." *Id.* at 25.

What is "holding" and what is not is, moreover, not completely clear with respect to both *Abankwah* and *Diallo*. Though carefully considered, *Diallo*'s approval of the BIA's corroborative evidence standard may not have been strictly necessary to *Diallo*'s result, in the sense that the opinion could have been written assuming *arguendo* the validity of that standard. As for *Abankwah*, while the passage quoted earlier in this footnote is central to the disposition of that case, the opinion also refers to the existence of corroborating evidence. *See id.* at 25–26.

supported by substantial evidence. The first was its holding that the fine receipt was not creditable because its denomination was in dollars. In so ruling, the BIA ignored Qiu's testimony that he was fined 1000 yuan, and the Board offered no basis for thinking that the Chinese characters on the receipt (a copy of which was submitted into evidence) signify American dollars rather than the local currency. Translator oversight is the patently obvious explanation for the "dollar" denomination of the translated receipt. And, in fact, the government, in its brief to this Court, concedes that the reference to dollars appears to be a translation error.

■ The BIA's second fact-finding error was its conclusion that the Chinese government did not believe that Qiu had two children at the time that he and his wife ostensibly fled to Tungto. From this the BIA inferred that the threat of forced abortion and sterilization that supposedly prompted their "flight" was not genuine.[12]

The sole explanation that the BIA gave for not accepting Qiu's version of the flight to Tungto, in 1981, is not based on a generic doubt about credibility.[13] Rather, it is that Qiu's 1993 household registry did not include his first son. Though Qiu testified that he listed this child with his brother "last year" (i.e., in 1993), the BIA speculated that Qiu must have recorded this child with his brother before then, because "it is unclear how all four [children] could have been registered previously [on Qiu's registry] without a problem." From this the Board concluded that "in 1981 during the pregnancy and birth of the third child the government would only have been aware of two of the applicant's children which, according to the applicant, was acceptable."

But this inference is not supported by substantial evidence. There is no record evidence or testimony that Qiu listed the child on his brother's registry before 1993. As for the BIA's supposition that if four children had been listed on Qiu's registry before 1993, Qiu would have "had problems," the record shows that Qiu did "have problems." At the very least, his family was fined in 1985 for violating birth control policies.[14] Far from being grounded in record evidence, the inference at issue (extrapolating from Qiu's statement that he listed his eldest child on his brother's registry in 1993, to conclude that birth control officials did not know of Qiu's two children in 1981), dangles from a chain of flimsy speculations.

b. *The "Whole Record"*

■ The BIA's ruling did not mention Qiu's testimony regarding the smashing up of his home by the birth control team, the exclusion of his fourth child from school and from food subsidies, and Qiu's 1981 dismissal from his job, all of which, Qiu alleges, occurred because of his family's violation of population policies—and all of which fit the pattern of family planning enforcement as described by the State Department report.[15] It cannot be said that these events are "too insignificant to merit discussion." *Cf. Douglas v. INS*, 28 F.3d

**12.** This threat of forced abortion constitutes an instance of persecution alleged by Qiu that is separate from the actual sterilization and fine discussed earlier in this opinion.

**13.** We do not foreclose the possibility that, after a new hearing, Qiu will be determined to be incredible. If this should occur, then the IJ would have good reason not to believe Qiu's story of his "flight to Tungto." Nothing

in this opinion limits the IJ's ability, on remand, to test Qiu's credibility.

**14.** Other "problems" are discussed under the heading "The Whole Record," *infra*.

**15.** *See* United States Department of State, Bureau of Human Rights and Humanitarian Affairs, China—Country Conditions and Comments on Asylum Applications 26 (May 26,

at 244. To the contrary, (1) they might be thought incidents of persecution on account of "resistance" to the population control policy, *see* 8 U.S.C. § 1101(a)(42), and (2) they further suggest that China was vigorously pursuing its population policy with respect to Qiu and his family.[16]

### D. The IJ duty to assist in developing the petitioner's case.

The remaining question put to us is whether the IJ has a duty to assist even the counseled petitioner in developing his case. We think it prudent not to reach this open question of law, which is not necessary to our decision and which, though posed, was not truly argued in the appellant's brief.[17] *Cf. Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

### III. CONCLUSION

Because the Board of Immigration Appeals's decision to reject Qiu's appeal rests

---

1994) ("Disciplinary measures against those who violate the policy can include stiff fines, withholding of social services, demotion and other administrative punishments, including, in some instances, loss of employment. Unpaid fines can result in confiscation of personal property, or even destruction, such as tearing down of houses, but we believe this occurs relatively rarely, and only in the most poor areas.")

**16.** Of course, while these events are not insignificant, Qiu's *testimony* as to these events only matters for the disposition of his application insofar as that testimony is credible. *Cf.* note 13, *supra*.

**17.** We believe the question to be nontrivial, however. The Immigration and Nationality Act provides that the IJ "shall ... receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). The BIA has held that "the [Immigration and Naturalization] Service and the Immigration Judge both have a role in introducing evidence into the record." *In re S–M–J*, 21 I. & N. Dec. 722, 726, 1997 WL 80984 (BIA Jan. 31, 1997). That decision further counsels that "in light of the bifurcated process experienced by many asylum applicants, whereby applicants begin with a nonadversarial approach at a Service Asylum Office and move to a more 'adversarial' proceeding before an Immigration Judge, a cooperative approach in Immigration Court is particularly appropriate." *Id.* at 723–24. But the nature and extent of the IJ's duty has been disputed by members of the Board. *Compare In re S–M–J*, 21 I. & N. Dec. at 727–30 (recognizing an IJ duty to place reports on general country conditions into evidence, and advising the IJ to "ensure that the applicant presents his case as fully as possible with all available evidence") *with In re A–S*, 21 I. & N. Dec. 1106, 1127, 1998 WL 99553 (BIA, Feb. 19, 1998) (Rosenburg, dissenting from the Board's denial of the applicant's appeal) ("[A]lthough the majority decision in *Matter of S–M–J–* emphasizes that the Immigration Judge is expected to assist in clarifying and bringing out evidence in support of the asylum seeker's claim, this record is devoid of any indication that the Immigration Judge took any steps to encourage the applicant in providing such additional evidence or clarification.").

Our court has yet to consider whether the IJ has any duties in these respects and, if so, what is the proper remedy for breach. In a recent case where these questions could have arisen, they apparently were not argued, and we were left to comment only that it was "unfortunate that ... basic and relevant testimony ... was not elicited from petitioner." *Guan Shan Liao*, 293 F.3d at 70. We have, however, prodded immigration tribunals to give petitioners a chance to respond to the adjudicator's concerns about "missing" or inconsistent evidence or testimony. *See, e.g., Alvarado–Carillo*, 251 F.3d at 56 ("To the extent that the BIA determines on remand to accord significance to any inconsistencies, we encourage the BIA to consider providing some means for petitioner to offer an explanation for them. We note that, on appeal to the BIA, petitioner was able to explain to the BIA's satisfaction the inconsistencies relied upon by the IJ, but was not provided the same opportunity to address the items raised *sua sponte* in the BIA Opinion ....") (internal citation omitted).

on (1) a misapprehension of the difference between testimony that is vague, in the sense of not identifying a set of facts that qualify the applicant as a "refugee" within the meaning of the Immigration and Nationality Act, and testimony that, though lacking in detail, does (if believed) so qualify the applicant; (2) corroborative evidence demands whose reasonableness is not explained; (3) findings of fact unsupported by substantial evidence; and (4) a failure to consider certain key events of record; the Board's decision cannot stand.

For the foregoing reasons, and in accordance with the parties' conditional agreement at oral argument, the petition for review is GRANTED; the decision of the Board of Immigration Appeals is VACATED; and the case is REMANDED to the BIA with directions to order a fresh hearing before an Immigration Judge.