You Hao YANG, Petitioner,

v.

**THE BOARD OF IMMIGRATION APPEALS, Respondent.**

**Docket No. 03–41198–AG.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 30, 2006.

Decided: March 3, 2006.

Gary J. Yerman, New York, N.Y., for Petitioner.

Roger W. Wenthe, Assistant United States Attorney for Daniel G. Bogden, United States Attorney for the District of Nevada, Las Vegas, Nev., for Respondent.

Before: CALABRESI, STRAUB, and WESLEY, Circuit Judges.

PER CURIAM.

Petitioner You Hao Yang ("Yang"), a citizen of the People's Republic of China, seeks review of an order of the Board of Immigration Appeals ("BIA") summarily affirming the decision of an immigration judge ("IJ"). The IJ rejected Petitioner's application for asylum and withholding of removal under the Immigration and Nationality Act of 1952, *see* 8 U.S.C. §§ 1158(a), 1231(b)(3)(A), on the ground that Petitioner was not credible. We assume that the parties are familiar with the facts, the procedural history, and the scope of the issues presented in the petition for review, which we reference only as necessary to explain our decision.

■■■ Where, as here, the BIA summarily affirms an IJ's opinion, we review the decision of the IJ directly. *See Dhoumo v. BIA,* 416 F.3d 172, 174 (2d Cir.2005) (per curiam) (citing *Secaida–Rosales v. INS,* 331 F.3d 297, 305 (2d Cir. 2003)). We typically afford "particular deference" to an IJ's credibility finding, "mindful that the law must entrust some official with responsibility to hear an applicant's asylum claim, and the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant." *Zhou Yun Zhang v. INS,* 386 F.3d 66, 73 (2d Cir. 2004). Accordingly, our review of an IJ's credibility determination is an "exceedingly narrow inquiry to ensure that the IJ's conclusions were not reached arbitrarily or capriciously." *Id.* at 74 (internal quotation marks and citations omitted). An IJ's credibility findings cannot, however, be based upon either "a misstatement of the facts in the record [or] bald speculation or caprice." *Id.*

■■ In the instant case, we find that none of the six reasons given by the IJ to support his adverse credibility finding are free of error.

(1) The IJ first stated that Petitioner's documentary evidence "in no way substantiate[d]" his testimony, and, "in fact, undermine[d] it." But the IJ neither identified pieces of evidence that he believed were necessary to support Petitioner's asylum claim, nor did he explain how Petitioner's submissions contradicted his testimony. Because we require an IJ to articulate "specific, cogent reasons" to support a credibility finding, *see Secaida–Rosales,* 331 F.3d at 307, and because we require an IJ to "(a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner," before "turn[ing] down a refugee candidate for want of sufficient corroboration," *see Jin Shui Qiu v. Ashcroft,* 329 F.3d 140, 153 (2d Cir.2003), we find that the IJ's first concern with Petitioner's testimony was not adequately supported. Moreover, the IJ failed to address petitioner's documentary evidence describing China's practice of suppressing Christian groups, as

well as the evidence specifically indicating that petitioner's church had been destroyed. *See Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir.2005) (explaining that we generally require "some indication that the IJ considered material evidence supporting a petitioner's claim"); *Yan Chen v. Gonzales*, 417 F.3d 268, 272 (2d Cir.2005) (criticizing BIA decision for failure to take into account country conditions report).

(2) The IJ noted that Petitioner had "failed to detail any knowledge ... that he is aware of any Christian dogma or doctrine," and that he had "offered no detailed statements regarding his own awareness or knowledge of Christian dogma, its precepts, its ideology, [or] the manner in which he prayed." But where, as here, an IJ harbors "nagging doubts about an applicant's credibility due to the spareness of [his] testimony," we have encouraged the IJ (along with the government) to "probe for incidental details, seeking to draw out inconsistencies that would support a finding of lack of credibility." *Qiu*, 329 F.3d at 152 n. 6, 152. During the asylum hearing in the case before us, the IJ asked no questions of Petitioner about his religious beliefs, and the government decided not to conduct a cross-examination. Nothing in the record suggests that Petitioner needed to present further evidence of his religious convictions, either to establish his eligibility for asylum,[1] or to render his testimony more credible. *Cf. id.* at 151–52 ("[S]ince the list of circumstantial details can be expanded indefinitely, a legal standard that empowers an IJ or the BIA to rule against a petitioner who fails to anticipate

the particular set of details that the factfinder desires (*but does not request, through questions directed to the applicant*) is no standard at all. It would enable the administrative decisionmaker to reject whichever applicants that fact-finder happens to disfavor." (emphasis added)).

(3) Moreover, the IJ improperly discounted Petitioner's testimony that he attended weekly religious services at a private church in China—testimony that the IJ himself seemingly acknowledged would establish Petitioner's religious beliefs. The IJ found this testimony incredible on the ground that, during the asylum hearing, Petitioner failed to testify that he had attended a state-run church with his family as he grew up, which he had mentioned in his written application. But we see no reason why Petitioner should, during his live hearing, have discussed a peripheral detail contained in his written application. Nor is there anything inconsistent between Petitioner's written submission, which indicated that his family attended a state-run church *as well as* the private services for which they were allegedly persecuted, and his hearing testimony, during which Petitioner focused on his participation in the private church.

(4) The IJ also claimed that Petitioner's hearing testimony was inconsistent with both a letter sent by his mother and with his original written application. But, like the putative contradiction between attending a state-run church and private Christian services, we find nothing incompatible

---

1. At times, the IJ's decision is hard to decipher. For instance, it is not clear if the IJ *intended* to suggest that Petitioner had not demonstrated that he was Christian, or if, as we read it, the IJ's decision rested solely on his adverse credibility determination, which was based in part on perceived inconsistencies as to Petitioner's involvement with the state-run church. We need not parse too

closely, however, the text of the IJ's opinion. For we find, examining the record *de novo* as to Petitioner's eligibility for asylum from religious persecution, that the record contains ample, uncontested evidence that Petitioner is Christian. *See Qiu*, 329 F.3d at 146 n. 2 (prescribing *de novo* review for the question of "what evidence will suffice to carry an asylum applicant's burden of proof").

about two statements, one of which merely adds facts that are not mentioned in the other. Thus, for example, Petitioner's testimony during the hearing that he was himself involved in preaching is hardly incongruous either with his written application—which expressly stated that Petitioner "sometimes" joined his mother when she "went on outreach trips to preach and to convert"—or with his mother's letter—which, although focused on her arrest and the construction of their church, at no point implied that Petitioner did not participate in preaching activities. *Cf. Zhang,* 386 F.3d at 74 (counseling deference to an IJ's decision "[w]here the IJ's adverse credibility finding is based on *specific examples* in the record of inconsistent statements by the asylum applicant about matters material to his claim of persecution" (quotation marks omitted) (emphasis added)).

(5) The IJ additionally based his adverse credibility ruling on his conclusion that Petitioner had "not offered any plausible explanation as to why his mother is still in China." The IJ, however, misconstrued *Matter of A–E–M–,* 21 I. & N. Dec. 1157 (BIA 1998), in asserting that such an explanation was necessary. In *A–E–M–,* the BIA held that a petitioner's objective fear of future persecution was undermined by his family members' remaining in his home country and not being harmed for a long period of time. *See id.* at 1160; *see also Eduard v. Ashcroft,* 379 F.3d 182, 193 (5th Cir.2004) ("In *Matter of A–E–M–,* . . . the BIA held that the reasonableness of an alien's fear of persecution is reduced when his family remains in his native country unharmed for a long period of time after his departure."). *A–E–M–* in no way supports the IJ's point that the credibility of a petitioner alleging persecution may be doubted if other family members who experienced persecution did not flee as well. There are, of course, innumerable possible reasons why one victim of persecution is able to flee a country, while another is not. We commonly encounter asylum claims that evince, for instance, the considerable financial investment that is required to leave China illegally. *See, e.g., United States v. Moe,* 65 F.3d 245, 247 (2d Cir. 1995) (stating that, in China, the "average smuggling fee per passenger was approximately $30,000"); *United States v. Si Lu Tian,* 339 F.3d 143, 149 (2d Cir.2003) (referencing testimony that "the snakeheads had increased the smuggling fee from $40,000 to $50,000").

(6) Unlike the other inconsistencies on which the IJ relied, one discrepancy was supported by record evidence. At his asylum hearing, Petitioner testified that his mother informed him, *in August 2000,* that their church had been demolished by the government. But Petitioner testified a moment before that the church was destroyed in *March 2001,* several months *after*—according to Petitioner's earlier testimony—his mother reported the incident to him. In the ordinary course, this sort of inconsistency, if left unexplained, could support an adverse credibility determination. The transcript of the hearing in this case suggests, however, that Petitioner, in creating the discrepancy, may have just misspoken or misunderstood the question.[2] When Petitioner's attorney immediately tried to revisit the chronology of events to give Petitioner a chance to clarify, the government unremittingly objected that questions as to when Petitioner learned of the church's demolition had been "asked and answered." And the IJ, rather than giving Petitioner and his lawyer an oppor-

---

**2.** The IJ asked petitioner: "The year 2001, does that come before or after 2000?" Petitioner initially responded "Before" and then subsequently replied "After."

tunity to rectify any misunderstanding or error in translation, sustained the government's objections. Under the circumstances, this was improper, and did more to obfuscate the underlying facts than to illuminate them. *See Giday v. Gonzales*, 434 F.3d 543, 2006 WL 20812, *4 (7th Cir. Jan.5, 2006) ("An immigration judge, unlike an Article III judge, is not merely the fact-finder and adjudicator but also has an obligation to establish the record."); *In re S–M–J–*, 21 I. & N. Dec. 722, 723–24 (BIA 1997) ("[I]n light of the bifurcated process experienced by many asylum applicants, whereby applicants begin with a nonadversarial approach at a Service Asylum Office and move to a more 'adversarial' proceeding before an Immigration Judge, a cooperative approach in Immigration Court is particularly appropriate."); *see also* Deborah E. Anker, *Law of Asylum in the United States* 167 (3d ed. 1999) ("The adjudicator, whether the Asylum Officer or the Immigration Judge, is not the applicant's adversary, and a 'cooperative approach' is appropriate in both settings." (internal citations omitted)).

Because of the errors described above, we cannot properly assess the weight that should have been given to this one response in determining petitioner's credibility in light of the record as a whole. *See Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 395 (2d Cir.2005) (explaining that where the IJ has made serious errors, we ordinarily vacate and remand "because we cannot determine whether the IJ would have reached the same conclusion had she not erred"); *Tian–Yong Chen v. INS*, 359 F.3d 121, 128 (2d Cir.2004) (indicating that, where a decision is "fatally flawed" in certain respects, "we are unable adequately to consider whether substantial evidence supports" the denial of asylum); *see also Xiao*

*Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 2006 WL 27427, *9 (2d Cir. Jan.6, 2006) ("If the testimony provided is otherwise 'generally consistent, rational, and believable,' the presence of some inconsistent testimony need not necessarily be fatal to a petitioner's claims if the disparities are 'relatively minor and isolated and do not concern material facts.' " (quoting *Diallo v. INS*, 232 F.3d 279, 288 (2d Cir.2000))).

We conclude that the IJ's adverse credibility determination was not supported by substantial evidence. We therefore remand the case to the BIA for reconsideration. Should the BIA find it appropriate to remand further, we strongly urge that this asylum application be assigned to a different IJ than the one who originally handled Yang's petition. *See, e.g., Wang v. Attorney Gen. of the United States*, 423 F.3d 260, 271 (3d Cir.2005); *Yi–Tu Lian v. Ashcroft*, 379 F.3d 457, 462 (7th Cir.2004); *Arulampalam v. Ashcroft*, 353 F.3d 679, 688–89 (9th Cir.2003).

Accordingly, the petition for review is GRANTED, and we VACATE and REMAND the case to the BIA for further proceedings consistent with this order.